FIRST NATIONAL BANK OF BOONE, Appellant, v. ROYAL INDEMNITY COMPANY, Appellee.

**INSURANCE:**    Construction—Boiler Insurance With Exception of
1   "Fire" Loss.  A policy of insurance against loss from explosion, rupture, collapse, cracking, and fracture of a steam boiler covers such loss when caused by *fire in the ordinary operation of the boiler,* even though the policy specifically excepts loss due to *fire.*  Such exception has reference solely to loss occasioned by fire disconnected with the operation of the boiler. '

**TRIAL:**    Direction of Verdict—Deduction From Circumstantial Evi-
2   dence.  Rarely would the cause of an injury be a question of law for the court, when such cause is a matter of deduction from circumstantial evidence alone.

*Appeal from Boone District Court.*—R. M. WRIGHT, Judge.

MARCH 7, 1922.

ACTION at law upon a policy of boiler insurance.  There was a trial to a jury.  Verdict directed for the defendant, and judgment against plaintiff for costs.  Plaintiff appeals.—*Reversed.*

*W. W. Goodykoontz* and *T. J. Mahoney,* for appellant.

*Sullivan & Sullivan* and *Dyer, Jordan & Dyer,* for appellee.

WEAVER, J.—On April 1, 1919, the defendant corporation, carrying on a business of boiler insurance, issued to the plaintiff a policy by the terms of which it agreed with the insured that:

1. INSURANCE: construction: boiler insurance with exception of "fire" loss.
"If there shall occur within the terms mentioned in Statement 8 of said schedule [hereinafter quoted] an explosion, rupture, or collapse as hereinafter defined of one or more of the boilers, vessels, or other apparatus described in Statement 6 of said schedule, then the company will indemnify the insured by paying to or for him up to a total amount not exceeding that stated in Statement 10 of the said schedule, for each such occurrence."

The promise is followed by an enumeration of "conditions," of which the following only have any bearing upon this controversy:

"3.   The company shall not be liable under this policy for (a) any loss or damage due to fire, or if the explosion, rupture, or collapse is caused directly or indirectly by fire, or * * * (e) If loss or damage is caused by mere cracking or fracturing of any part of the cast-iron boiler hereby insured without a specific premium paid for such coverage."

Following this is a series of "definitions," as follows:

"(a)   'Explosion' or 'rupture' shall mean a sudden substantial tearing asunder of the boiler or any part thereof caused solely by the pressure of its contents.   (b)   'Collapse' shall mean, a sudden crushing or forcing inward of the furnace or the flues or any other parts of the boiler caused solely by pressure. (c) 'Boiler' shall mean any vessel described by Statement 6 of the schedule and which is subject to internal pressure and shall include safety valves, steam and water gauges and all connecting pipes and fittings up to and including the valve nearest the vessel."

The schedule frequently referred to in the policy is entitled "Schedule of Statements," and, so far as material upon this appeal, they consist of statements of (1) name of the insured;

(2) post-office address; (3) business; (4) ownership of the boiler; (5) * * *; (6) description of the boilers covered by the insurance; (7) * * *; (8) the term of the insurance from April 1, 1919, to April 1, 1922; (9) premium for boilers described under Statement 6, $56. ''Premium charge for coverage of cracks and fractures in cast-iron boilers (see Condition 3, Section e), $64; (10) the amount of insurance shall be $5,000.''

On March 3, 1920, and while the policy was still in full force, the plaintiff alleges that the boilers so insured were damaged and destroyed by rupture, collapse, cracks, and fractures, to the injury and loss of the plaintiff to the amount of $2,900; and that defendant, upon due notice and proof of loss, neglects and refuses to pay the promised indemnity. Answering this claim, the defendant admits issuing the policy in suit, but denies there has been any loss or damage to the insured property for which it is under any obligation to indemnify the plaintiff. It further pleads that, by the terms of the policy, loss or damage due to fire is excepted from the risk insured against, and that the loss or damage for which plaintiff demands recovery was, in fact, due solely to fire.

For the trial of these issues, a jury was impaneled, and testimony offered. At the close of the evidence, the court directed a verdict for the defendant, and plaintiff appeals.

On the part of the plaintiff, the evidence tended to show that the boiler in question was located in a room or excavation under the sidewalk adjacent to the plaintiff's bank building. It was of a down draft, low pressure type, made to withstand a pressure of 15 pounds, but in actual use, was never subjected to a pressure of more than 5 pounds. The weather on the day of the loss, March 3, 1920, had been mild, and only a low fire had been maintained. One Hotchkiss was the custodian of the building, and had the immediate oversight and care of the heating apparatus. He had served in that capacity five years. It was his custom to leave the building about 5:30 P. M., returning again about 9 P. M., to bank the fire for the night. Before going to his supper on the evening in question, he attended to the fire in the usual way, and threw in some coal. At the same time he looked at the gauge, and found the water standing at the proper height of an inch above the water line or mark. It should

be said, also, that the boiler was of about 400 gallons' capacity, and the admittedly safe and proper height to which it should be filled for ordinary use was at or near the water line above mentioned. At about 6:35 P. M., the elevator boy, a 15-year-old lad, with a companion noticed the appearance or smell of smoke. The foot of the elevator was near the boiler room, and upon investigation, the boys discovered fire on the lower edge of the canvas sheet which held the asbestos cover of the boiler in place. They also heard a hissing noise, "like water going onto a fire." One of them ran upstairs, where one or more persons connected with the bank still remained, and gave the alarm. The custodian was immediately called by telephone, and he promptly appeared. The fire department was also called, and several other persons assembled, and saw in a general way the condition in the boiler room. Among those thus present was a witness Hoffman, a plumber, who installed the boiler originally, and thereafter was frequently employed in its care and upkeep. He arrived at the fire about 7 P. M. The custodian had returned, and with others, drew the fire from under the boilers to the cement floor of the room. Later, about 8:15 or 8:30, someone asked about the "blow-off valve," and Hoffman and another person made examination, and say that they found it about "three quarters open." On the following day, the boiler, which was made in sections, was taken down. Of the 26 sections or 13 double sections of which it was composed, the pair in front and the pair at the back were in apparently sound condition, and all the remainder were cracked, the center sections showing the most marked effect of heating or burning. When assistance arrived, and the fire box was opened, it disclosed a very high degree of heat, and some of the parts, especially those of the upper or water grate, being the grate nearest the body of the boiler, were burning or melting. The loss of the boiler was practically total, and its value was shown to be from $2,700 to $2,800.

For the defendant, an expert witness testifies that, three days after the loss, he made careful examination of the boiler, and did not see any evidence or signs of fractures or cracks at that time, but did find evidence of the melting and burning in the water grates, and of parts of the sections "around where

the water grates were.''   After describing the conditions as he found them, he says:

''I would say that the cause was nothing more than a dry boiler. If the blow-off valve was open, the water would run out. I could not see but what somebody opened the valve. Somebody just simply opened the valve.''

The foregoing statement does not include all the testimony, but it is sufficient to show the conflicting theories of the parties to the suit. In so far as the case turns upon the simple question whether the boiler was, in fact, ''cracked or fractured,'' it can hardly be contended that there was no evidence to take that inquiry to the jury. The vital issue, however, is presented by the defendant's contention that, whatever may be the truth as to the alleged cracks and fractures in the boiler, the injury so sustained by the plaintiff was ''due to fire,'' and is, therefore, not covered by the policy.

It may be well here to recall just what indemnity the defendant does promise to its policyholder. The contract recognizes a distinction between loss or damage to the boiler by ''explosion,'' ''rupture,'' or ''collapse,'' and loss or damage caused by ''mere cracking or fracturing'' of the boiler; and for indemnity of this latter character, a special or additional premium is exacted. Plaintiff's policy is made to provide indemnity against both of these classes of hazards; and for its insurance against cracks and fractures of the boiler, it paid defendant a premium of $64, and for insurance against explosion, rupture, or collapse, it paid the further sum of $56. To make clear and certain the nature of the risk, the policy carefully defines what is meant by ''explosion,'' ''rupture,'' and ''collapse;'' and it is sufficient here to say that the loss alleged by plaintiff is not covered by either definition. It follows that, if plaintiff is entitled to recover at all, it is under the defendant's promise to indemnify it against loss by the cracking or fracturing of the boiler.

One other noticeable feature of the policy is the frequent use of the word ''occurrence;'' and here again the insurer is at pains to carefully define just what that term shall be held to mean, in construing its contract. It says ''occurrence'' shall mean the ''explosion, rupture, or collapse of any boiler;'' but,

as we have seen, there is no proof of any *such* occurrence. If we bear these contract definitions in mind, it will be of aid in construing and applying the policy. There is no attempt to attach a contract definition to the words ''cracks'' and ''fractures,'' and they are to be construed as having the meaning attached to them in common or popular usage. The provisions in the policy relating specifically to loss of this kind are very meager. The only direct reference thereto is found, first, in a condition following the general indemnity clause to the effect ''that the company shall not be liable for loss or damage caused by mere cracking or fracturing of any part of the cast-iron boiler without a specific premium paid for such coverage;'' and again, in the ninth item in the so-called ''schedule,'' we find an acknowledgment that the company has received its premium ''for coverage of cracks and fractures in cast-iron boilers.'' If this were all, and a jury should find that the boiler was cracked or fractured, we think the further question whether the loss or damage complained of was caused by such cracks or fractures was also a question of fact, for the jury to pass upon.

We now come to consider the effect of that other policy provision which reads:

''The company shall not be liable under this policy for any loss or damage due to fire, or if the explosion, rupture, or collapse is caused directly or indirectly by fire.''

To bring the case within that exception, it is argued by defendant that the loss was occasioned by exhausting or draining the water from the boiler, and thereby exposing the structure of the boiler to a destructive heat.

Passing, for the present, the question whether this fact, if found to be established by the evidence, would relieve the defendant from liability, it is sufficient to say that the proof is not so conclusive as to make it a matter of law. That there is considerable testimony tending to support that theory must be admitted; but the negative of that proposition is not without substantial support. Nobody saw, and no one can say from personal knowledge or observation, just when or just how the cracking or fracturing of the boiler occurred. The open ''blow-off'' valve was not discovered until an hour or two after the alarm had been given, and after numerous persons had visited

the boiler room.  No one is able to say, except as a matter of opinion, that the valve was opened before the loss occurred.  An expert witness examined it the following morning, and gives it as his opinion that there "was water in the lower portions of the boiler at the beginning of the trouble."  There is evidence, too, that boilers will and often do crack, even when filled with water; that cracks are often produced by expansion and contraction of the metal, and may sometimes be caused by scales or deposits in the interior of the boiler.  The defendant's expert witness says:

"There are different things which will cause a boiler to crack.  It is mostly when the boiler is hot, and you open up the feed valve and let cold water into the boiler.  That will crack a boiler quicker than anything else.  *That is a matter of uneven expansion.*"

That cast iron will at times crack from a variety of causes, as well as from causes which are not readily apparent or discoverable, is a matter of common knowledge and observation; and we are not ready to hold that even the most competent, expert witness, testifying only from a "post-mortem" examination of a given crack or fracture, and giving his opinion as to its origin or cause, will establish the cause as a matter of law. But even if we assume the absolute correctness of the witness, and accept his judgment that this cracking and fracturing were a matter of uneven expansion of the iron, does it follow that a loss so occurring is not covered by the policy?  Defendant contends that it is not, because of the provision of the policy already quoted, which excepts "loss or damage due to fire." The argument, reduced to simple English terms, is that, if the boiler was cracked, the crack was occasioned by the uneven expansion of the iron; the expansion of the iron was occasioned by heat; the heat was occasioned by fire; and because of this chain of cause and effect, the resulting loss and damage must 'be held, as a matter of law, to be "due to fire," within the meaning of the contract.  With this contention we cannot agree.  In the first place, the argument so advanced, carried to its logical result, would render the entire contract of not the slightest protection to the insured.  It professes, for example, to insure the policyholder against loss or damage to its boilers by explosion,

rupture, or collapse, caused by pressure of their contents. Now such pressure (aside from the mere weight of the water in a boiler) is caused by the expansive energy of steam; steam is produced by the action of heat upon the water; and heat is produced by fire in the furnace or fire box: therefore, if the boilers be destroyed by an explosion, rupture, or collapse, the defendant would not be liable for a dollar, because the policy provides against liability for loss "caused directly or indirectly by fire." Surely, such was not the intention of the parties to the contract. It must be presumed that the defendant was insuring plaintiff against a risk of *some* kind. When we stop to consider the nature of the business which defendant was organized to transact, the force and effect of the exception of liability for loss or damage due to fire are reasonably apparent. The company was not doing a business of fire insurance, and we may assume that, had it undertaken to issue a fire insurance policy, it would have been *ultra vires* and void. Its policy bears the caption, "Steam Boiler Excess and Multiple Policy," and is evidently intended to be understood to provide insurance against the risks to which steam boilers are peculiarly subject. To the apprehension of the average person, those risks are precisely those of which we have spoken, and are enumerated in the contract: explosion, rupture, collapse, cracking, and fracture. Without furnace fire, to heat the water and produce steam, the boilers could not be utilized for the purposes for which they are designed, and the entire outfit would be simply a mass of inert and dead material, exposed to no risk, and needing no insurance, unless, perhaps, it be against the burning of the building which houses it,—a kind of insurance which this company could not furnish. The policy as a whole makes it perfectly clear that the company insured this boiler with the knowledge and understanding that it was one in actual and practical use for its designed purpose, the furnishing of heat to the plaintiff's office building; and that, in the provision declaring the insurer "not liable for any loss or damage due to fire, or if the explosion, rupture, or collapse is caused directly or indirectly by fire," the word "fire," as used in that clause, has no reference to fire under the boiler, without which it could not be operated or used, but rather, to what (for the want of a better word) we may call a "hostile fire," thus

emphasizing to the policyholder the fact that the insurer assumes no risk of fire hazard from any outside source. If, for example, the plaintiff's office building were burned down, carrying with it to destruction the heating apparatus in the furnace room, there would be no liability under this policy; but it savors of absurdity to say that like immunity is reserved where the risk expressly insured against necessarily implies the use of fire in the furnace. The exception made in the policy is in the nature of a notice or warning to the property owner that the company is not assuming the risk of ordinary fire hazard, but confines its liability to those risks which pertain directly and immediately to the maintenance, operation, and use of such boilers for their designed purposes. That the company appreciated these hazards, and knew the risk of the appearance of cracks and fractures in the boiler, is shown in the fact that it demanded and received a special premium therefor, considerably in excess of the premium for all other insurance. If the construction we have put upon the policy is correct, the fact, if it should be a fact, that the cracks or fractures, if any, in the boiler were due to concealed or inherent defect in the boiler, or that the negligence of the custodian or of the elevator boy contributed to the result, would constitute no defense to the claim sued upon.

The appellee, in argument, bases its claim to a directed verdict upon two propositions: First, that the contract is to be construed according to the plain, ordinary, and popular sense of common speech; and second, it is said that there are no disputed questions of fact presented by the record. With the first rule stated, there can be no serious dispute; but even words of everyday and familiar use are not always used in precisely the same sense. To ascertain the effect of a given word in a given writing, it must be read in the light of its context, of the instrument as a whole, and of the circumstances attendant upon its use. We think there is no violation of this canon of construction in our treatment of this contract.

The remaining contention, that the evidence in the case presents no disputed questions of fact, is not borne out by the record. True, there is no dispute that the contract of insurance was made, or that the boiler has since been destroyed; but

2. TRIAL: direction of verdict: deduction from circumstantial evidence.

there is very little else in the way of material facts which is without dispute. For example, the question whether the boiler was cracked or fractured is one of the vital issues in the case, and is the subject of radical dispute between witnesses. Peining, the defendant's expert witness, swears that there were no cracks to be found. Hoffman and others swear that there were several cracks and fractures. So, too, upon the varying conditions productive of cracks, there are very material differences in the testimony as to the facts, as well as in the opinions of witnesses. Moreover, as already suggested, there being no direct testimony as to when or how the cracks appeared, or the cause of them, resort may be had—indeed, must be had—to circumstantial evidence. Such a case nearly always presents a jury question. To be sure, the burden is upon the plaintiff to establish his case by a preponderance of evidence, but he does not fail, as a matter of law, merely because he is unable to sustain his claim by eyewitnesses. If he shows circumstances reasonably tending to establish his theory, and the jury holds with him, the verdict will not be set aside simply because the court may think the opposing theory is the more likely to be true. As this court has said:

"The question for the court is not whether reasonable minds might differ as to which theory was better supported by the evidence, but whether the theory adopted, upon which liability is predicated, is so sustained by the record that a fair controversy exists as to whether or not it is, in fact, the true theory." *Carpenter v. Security Fire Ins. Co.,* 183 Iowa 1226, 1234.

The issuance of the policy of insurance against cracks and fractures in the boiler being admitted, and there being competent evidence that cracks and fractures did occur, we discover no sound reason for withdrawing the question of defendant's liability from the jury.

The motion for a directed verdict should have been overruled. For the error in such direction, a new trial must be ordered. The judgment of the district court is—*Reversed.*

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.