NEW ENGLAND GAS AND ELECTRIC ASSOCIATION & others *vs*. THE OCEAN ACCIDENT AND GUARANTEE CORPORATION, LIMITED.

Suffolk. May 7, 1953. — December 15, 1953.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & COUNIHAN, JJ.

*Insurance*, Machinery insurance, Prevention of business insurance. *Practice, Civil*, Auditor: inferences from findings; Case stated; Agreed facts; Agreement as to evidence. *Words*, "Accident," "Sudden."

The proper ultimate conclusions to be drawn by inference from the subsidiary findings of an auditor whose findings are final and whose report constitutes a case stated are to be determined by this court, which is not bound by the conclusions drawn by the trial judge. [644]

A document entitled "stipulation as to facts" submitted to an auditor by the parties to an action and stating that certain facts were deemed to be established, that the parties could introduce "other evidence," and that reasonable inferences might be drawn was not an agreement as to all material facts but was rather an agreement as to evidence. [647–648]

The words "sudden and accidental" in a machinery and boiler insurance policy insuring against damage from "a sudden and accidental breaking" of machinery described a result rather than the means by which that result was brought about. [651–652]

In the circumstances, the actual cracking of the spindle of a turbine originating from excessive stress due solely to an unintentional and unknown missetting of the springs supporting the condenser of the turbine eleven months before the cracking of the spindle was "accidental" within the meaning of that word in a machinery and boiler insurance policy insuring against damage from "a sudden and accidental breaking . . . or rupturing." [652–653]

New England Gas & Electric Assoc. v. Ocean Accident & Guarantee Corp. Ltd.

In the circumstances, the cracking of the spindle of a turbine occurring after there had been excessive stress on the spindle for several hours due to a missetting of the springs supporting the condenser of the turbine eleven months before the cracking of the spindle was not reasonably to be anticipated and was "sudden" within the usual concept of that word and within its meaning as used in a machinery and boiler insurance policy insuring against damage from "a sudden and accidental breaking . . . or rupturing." [653–654]

The mere fact that a mechanical maladjustment which ultimately brought about damage to a turbine during the term of a machinery and boiler policy insuring against accidental damage to the turbine antedated the commencement of the term by some nine months did not remove the damage from the risk insured. [655]

Loss due to cracking of the spindle of a turbine was within the coverage of a machinery and boiler insurance policy insuring against damage from "breaking . . . or rupturing" although a latent mechanical maladjustment causing the cracking was in existence at the commencement of the term of the policy, where a correction of the maladjustment would have eliminated any potential danger from it and it did not bring about the cracking until after the policy term began; a reservation by the insurer of a right of inspection and a right to suspend the insurance upon "discovery of a dangerous condition" indicated that the insurer contemplated a possibility that the turbine might not be in perfect mechanical condition and that inspections were necessary to protect its interests. [655–657]

Under a policy of insurance against "loss on the property of the Assured directly damaged by . . . Accident," the insurer was not freed from liability to pay the cost of replacing property so damaged merely because the one who furnished the replacement made no charge to the insured. [657–658]

Under an insurance policy providing for payment of indemnity to the insured, a company engaged in producing electricity, for every day on which, due "solely . . . [to] an Accident," its production was reduced below a production standard called "current business," the insured, after an accidental cracking of the spindle of one of its turbines putting that turbine out of service until the spindle was replaced after an interval of several months, during which the production of electricity was less than "current business" on most days, was not entitled to recover such daily indemnity where it appeared that other equipment of the insured was adequate to sustain peak loads and to produce "current business" during that period and that the sole reason for such lessened production was lack of demand. [663]

Under a policy of insurance with a clause providing indemnity to the insured against "loss on the property of the Assured directly damaged by . . . Accident," excluding "loss from any indirect result of an accident," claims by insured companies producing, distributing and selling electricity, made after an accident damaging a turbine on the premises of one of the companies, for expenses incurred through leas-

New England Gas & Electric Assoc. *v.* Ocean Accident & Guarantee Corp. Ltd.

ing, altering and operating a generating station, setting up additional transformers, increased costs for fuel and current, and operating a standby plant were for incidental losses which could not be recovered under such clause; nor could the insured companies recover for such expenses under another clause covering certain extra expenses incurred at the written direction of the insurer where it appeared that the insurer gave no such direction.   [664–665]

CONTRACT.   Writ in the Superior Court dated July 6, 1948.

The action was heard by *Dowd,* J., upon the report of an auditor.

*Edward C. Park,* (*Charles C. Worth* with him,) for the plaintiffs.

*George B. Rowell,* (*Martin J. Dever* of New York & *Franklin N. Cunningham* with him,) for the defendant.

RONAN, J.   This is an action of contract upon a machinery and boiler policy issued as of April 9, 1947, which had attached thereto a use and occupancy indorsement for the payment of a daily indemnity, so called, for each day the insured were prevented totally or partially from conducting their business by reason of the happening of an event which was insured against in the policy.   The action was referred to an auditor whose findings of fact were final. He found for the defendant.   The plaintiffs excepted to the denial of their motion to recommit the report, to the allowance of the defendant's motion to overrule the plaintiffs' objections to the report and that the report "be confirmed," [1] and to the granting of the defendant's motion for judgment.   The defendant excepted to the denial of its motion to strike out portions of the report, to the order overruling its objections to the report, and to the order confirming the report in so far as the court confirmed certain portions of the report to which the defendant had

---

[1] The motion in so far as it relates to the confirming of the report has no standing.   *Louis H. Salvage Shoe Co.* v. *Keith, ante,* 91.   Upon the coming in of the report of an auditor whose findings of fact are final, to which no objections are filed or if filed are overruled, the only duty of the judge is to order the judgment required by the report.   *Howland* v. *Stowe,* 290 Mass. 142, 146. *Old Mill Point Club, Inc.* v. *Paine,* 308 Mass. 505, 506.   *Union Old Lowell National Bank* v. *Paine,* 318 Mass. 313, 315.

objected. The exceptions arising out of these rulings are brought here by a consolidated bill of exceptions.

The insured named in the policy were the New England Gas and Electric Association and twelve affiliated and subsidiary companies or corporations including the New Bedford Gas & Edison Light Company, hereinafter called New Bedford, the Cape & Vineyard Electric Company, hereinafter called Cape, and the Plymouth County Electric Company, hereinafter called Plymouth. The New England Gas and Electric Association, hereinafter called New England, was a voluntary association under a written declaration of trust. It owned all the capital stock of Cape and Plymouth and 97% of the stock of New Bedford. It was a public utility holding company engaged in supervising the business of its operating subsidiaries. New Bedford produced, distributed, and sold electricity to its customers in the southeastern part of the Commonwealth. Plymouth purchased the greater part of its electricity in bulk from New Bedford and the remainder from Brockton Edison Company. It generated no electricity. Cape purchased all of its electricity from New Bedford except that during the summer it operated a small plant having a capacity of 1,360 kilowatts on Martha's Vineyard for distribution of electric current on that island. These three corporations really formed an integrated system, with New Bedford as the principal source of supply.

The shaft or spindle of one of the turbines at the New Bedford plant was so badly cracked that it became necessary to shut the turbine down and to replace the spindle by a new one. The liability of the defendant to pay the damage arising from the cracking of the spindle and to pay daily indemnities depends on whether that event came within the provisions of the policy. One provision, in so far as now pertinent, reads: "To Pay the Assured for loss on the property of the Assured directly damaged by such Accident (or, if the Company so elects, to repair or replace such damaged property)," excluding losses from various sources not here involved. Another provision, in so far as material,

reads as follows: "If the word 'Breakdown' is so entered, [1] 'Accident' shall mean a sudden and accidental breaking, deforming, burning out or rupturing of the Object or any part thereof, which immediately impairs the functions of the Object and necessitates repair or replacement before its functions can be restored . . . ." The first question is whether the cracking [2] of the spindle in the circumstances disclosed by the auditor's report was an accident [3] within the property damage clause.

The case was heard by an auditor whose findings of fact were to be final. His report was in effect a case stated. *Merrimac Chemical Co.* v. *Moore,* 279 Mass. 147. *Monaghan* v. *Monaghan,* 320 Mass. 367. The report, construed in accordance with the governing principles of law, furnished the sole basis for determining the correct order for judgment that should be entered in the case. In reviewing the action of the trial judge in entering an order for judgment for the defendant we have before us all that he had, and consequently we are in the same position as to both law and fact that he was. The auditor has stated very properly that his ultimate findings of fact rest upon his subsidiary findings, all of which are contained in the report. All of his findings which are not inconsistent with each other or which do not appear to be tainted with error of law must stand. His ultimate conclusions, however, which rest solely by way of inferences upon his subsidiary findings, are open to review here as matter of fact. In this respect, we are not bound by the action of the judge below as to the inferences he drew from the facts found. We must use our own judgment and determine what ultimate conclusions should flow from the subsidiary findings. *United States Fidelity & Guaranty Co.*

---

[1] The word "Breakdown" was so entered in schedule No. 4, paragraph C, subparagraph (a), by the substitution of this paragraph for one contained in a policy previously offered to the insured.

[2] The auditor sometimes describes the damage to the spindle as a rupturing or breaking but more often as a cracking, apparently using these terms synonymously. The parties have done likewise. We shall generally refer to it as a cracking.

[3] Liability under the use and occupancy indorsement was also limited by indorsement No. 1 to an accident as defined in the policy.

v. *English Construction Co.* 303 Mass. 105, 109–112. *Gall-uzzi* v. *Beverly,* 309 Mass. 135. *Wilkie* v. *Randolph Trust Co.* 316 Mass. 267, 268. *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 193. *Union Old Lowell National Bank* v. *Paine,* 318 Mass. 313, 315–316. Where the findings by way of inferences from the subsidiary facts were not warranted, and where, if the proper inferences were drawn, an order for judgment different from that entered by the trial judge was required as matter of law, we have reversed the judge's order and directed the entry of the correct one. *Avery* v. *R. E. Guerin Trucking Co. Inc.* 304 Mass. 500, 506. *Galante* v. *Brockton,* 305 Mass. 480. *Galluzzi* v. *Beverly,* 309 Mass. 135, 138. *Lewis* v. *Conrad & Co. Inc.* 311 Mass. 541, 546. *Mahoney* v. *C & R Construction Co.* 311 Mass. 558, 559. *Howes* v. *Warren,* 321 Mass. 475.

### PROPERTY DAMAGE INSURANCE.

New Bedford purchased from Westinghouse Electric & Manufacturing Company, hereinafter called Westinghouse, a 20,000 kilowatt condensing turbine generator, hereinafter referred to as No. 1 turbine. The installation of this turbine began in January, 1946, and it was completely assembled except for generator leads and safety devices by Westinghouse on January 16, 1947. The spindle of the turbine was made of very high alloy steel from a single forging. It varied in diameter from a little less than nine inches to two feet. A boring three or four inches wide ran through its center. Blades were attached to the outside of the spindle so as to cause it to revolve from the impact with superheated steam which was discharged against them. Stationary blades were attached to the inside of the cover or shell of the turbine evidently to channelize the flow of the steam against the blades of the spindle. Outside of this shell was insulating material covered by a sheet metal casing. The spindle rested horizontally on two bearings, one where the steam was let in, and the second one, hereinafter called the No. 2 bearing, near the exhaust and where the steam was

let out into the condenser. The spindle was coupled to the generator near this second bearing, so that the spindle and generator revolved at the same speed, which in normal operation was 3,600 revolutions a minute.

The condenser, the function of which was to cool and convert the steam, after it had been utilized in the propulsion of the spindle, into water which was returned to the boilers where it was reheated and used again, was purchased from and set up by C. H. Wheeler Manufacturing Company, hereinafter called Wheeler. A part of its weight was supported by a flange firmly attached to the casing near the exhaust end of the turbine, and the remainder of its weight was supported by four legs each of which rested upon a metal plate supported by a bank of eight steel springs which in turn rested on the top of a concrete pier. Each of these banks of springs had a device for setting their tension. The condenser was originally designed with an eccentric setting showing its center of gravity to be 16.6 inches off the center line of the turbine exhaust and during the normal operation of the condenser a turning moment would be created about the longitudinal center line of the turbine of about 330,000 foot pounds. It was to counterbalance this designed moment that the spring settings were devised. Due to an error the condenser was set up by Wheeler with its center of gravity 32.5 inches off the center of the turbine exhaust which greatly increased the turning moment. In April, 1946, Wheeler tightened up the springs to such an extent that they supported more than the weight of the condenser and resulted in lifting the turbine off the "chairs" upon which it rested. In June, 1946, the springs were adjusted so that the turbine was let down to rest on its foundation. A conference was held between Westinghouse employees and Wheeler employees, and the latter in July, 1946, again set the springs. This setting did not agree with the drawings and instead of compensating for 330,000 foot pounds an actual turning moment of 584,000 foot pounds was created. Indeed, the hydraulic effect during the subsequent operation of the condenser created a turning moment which varied

from 635,000 to 679,800 foot pounds depending on whether one or two pumps were used.

The turbine was first started in January, 1947. It was subjected to a series of tests. The generator was out of commission for a month because due to an error a large quantity of oil had been pumped into it. In the latter part of February, 3,000 kilowatts of electricity were produced but the turbine was then shut down due to boiler incapacity. On May 13, 1947, its load was limited to 7,000 kilowatts due to the incapacity of the boilers to produce a throttle temperature of 900 degrees Fahrenheit as called for by the specification. A series of tests was made by Westinghouse employees during the period of May 13 to May 17. The turbine was run from May 24 to May 29 with temporary bus connections and without some safety devices. On May 26, 1947, a load of 18,000 to 20,000 kilowatts was acquired. From June 2 to June 6 the turbine was being run with loads varying from 9,600 to 20,400 kilowatts. The turbine was on the turning gear for tests and inspections of the generator leads and adjustment of the boiler equipment. The turbine was started up about 5:30 o'clock on the morning of June 9, 1947, and ran for approximately an hour at a speed of 300 to 500 revolutions a minute; it was then speeded up and about seven o'clock it was placed on the line. As it was being brought up to speed the turbine was running rougher than usual and this roughness increased and became so violent that it was shut down about 2:30 o'clock in the afternoon. A subsequent examination by Westinghouse employees disclosed a crack extending 190 degrees around the neck of the spindle, which passed completely through and underneath the gland steeple appearing on the opposite side, and a series of fatigue cracks along the remaining 170 degrees. A new spindle was furnished by Westinghouse, the installation of which was completed on October 31, 1947, and which was put in service on November 3, 1947.

During the hearings before the auditor the parties submitted to the auditor a "stipulation as to facts" in which they agreed "that the facts hereinafter stated shall be

deemed at the trial to have been established, that other evidence may be offered by the parties and that all reasonable inferences consistent with the agreed facts may be drawn from such agreed facts and any evidence introduced." It was stated in one paragraph that the turbine was taken out of service on June 9, 1947, for causes described in the testimony taken on oral depositions of certain employees of Westinghouse. The transcript of the testimony of these witnesses comprising two hundred fifty-nine pages together with twenty-three exhibits was introduced in evidence and is incorporated in the bill of exceptions. The entire stipulation contains thirty-two paragraphs. The defendant objected to the materiality of matters contained in eight paragraphs, reserved its rights to object to matters recited in fourteen paragraphs, and, while conceding that certain computations were correct, did not agree that they showed any liability upon its part. The nature of the document supports its opening paragraph that certain facts are deemed to be established, that the parties could introduce evidence, unlimited so far as appears to any issue, and that reasonable inferences may be drawn from any of the testimony. We think that the depositions were properly submitted to the auditor as evidence, and that he was to determine from the transcript as best he could what were the causes of, and to what extent each brought about, the shutting down of the turbine on June 9, 1947. The stipulation was not an agreement as to all material facts but it was rather an agreement as to evidence and it was properly so considered and treated by the auditor. *King Features Syndicate, Inc.* v. *Cape Cod Broadcasting Co. Inc.* 317 Mass. 652, 653. *Mellen* v. *Modern Parlor Frame Corp.* 321 Mass. 305. *Lapp Insulator Co. Inc.* v. *Boston & Maine Railroad, ante,* 205.

The auditor considered each of the six causes assigned by these deponents for the failure of the turbine, to wit: (1) excessive forces and moments placed on the turbine exhausts by the condenser, (2) generator being run on high ambient inlet gas temperatures, (3) no allowance for differential expansion between generator and turbine on original

alignment, (4) turbine exhaust feet not sliding readily, (5) turbine running with misalignment sideways due to combination of causes 1 and 4 just mentioned, and (6) air binding of generator hydrogen coolers which probably aggravated misalignment. After carefully considering these causes, the auditor decided that the second cause was a matter of relatively small, but not completely negligible, importance; that the sixth cause was of no importance; that the third cause was of no great importance as it was a factor to be expected in the normal operation of the turbine; that the fourth cause relative to the improper sliding of the feet of the turbine resulted from the heavy load imposed on them by the turning moment due to the missetting of the condenser support springs; and that the fifth cause relative to the No. 2 bearing running sideways and the misalignment of the spindle was due to the wrong setting of the condenser springs. As to the first cause assigned relative to the excessive moments placed on the turbine exhaust flange by the condenser, the auditor found that the force exerted by the condenser on the flange was not alone sufficient to crack the spindle, but that in combination with other forces, all of which it was reasonably anticipated would occur in the operation of the turbine, this force imposed on the flange was the substantial real cause of the misalignment which eventually resulted in the cracking of the spindle. He also found that from the time the turbine was first operated it was inevitable that at times a combination of these reasonably anticipated forces with the moment due to the missetting of the springs would reach a point at which the failure of the spindle would occur, but that in the absence of the missetting of the condenser springs no stress would have been created sufficient to crack the spindle; that because of the missetting of the springs by Wheeler in July, 1946, the turbine was never, up to the occurrence of June 9, 1947, in good and safe operating condition; that no stress was imposed upon the spindle until the position of the No. 2 bearing was changed, but that the operation of the spindle not in line with its bearing sub-

jected it to a stress which, as it continued, caused some rupturing of the molecules in the spindle and more or less of a breaking through between the crystals and gradually built up to the point where the stress was great enough to cause fatigue cracks; that after the stress was actually imposed on the spindle, it required from one half million to two million cycles to develop the crack and the damage to it was completed in 2.4 to 10 hours after the spindle or shaft itself was affected, but that some portion of the aforesaid stress was applied to the shaft from the first time the turbine was operated. On this phase of the case, the auditor concluded that the incorrect setting of the springs first affected the turbine casing, secondly changed the position of the No. 2 bearing pedestal of the spindle, and thirdly caused a misalignment of the spindle and eventually caused its cracking; that there was a deformity or rupture of the spindle resulting from the missetting of the springs; and that the deforming or rupturing of the spindle was gradual and not sudden and, on June 9, 1947, had progressed to such an extent that it impaired the functions of the turbine and necessitated repair or replacement before its functions could be restored.

The event insured against was the sudden and accidental deforming, breaking, or rupturing of the turbine or any part of it so that its function was immediately impaired and its repair or replacement required. All these elements must be proved by the insured in order to recover under the policy; *Connolly* v. *John Hancock Mutual Life Ins. Co.* 322 Mass. 678, 681. *Rich* v. *United Mutual Fire Ins. Co.* 328 Mass. 133, 134.

We first discuss the question whether the damage to the spindle was accidental.

The auditor made no finding whether the damage was accidental. That was one of the principal issues presented at the hearing before him and it was his duty to decide it. It may be that he deemed a finding unnecessary in view of his conclusion that the cracking was gradual and not sudden. It is true that he traced the origin of the stress that de-

stroyed the spindle to the missetting of the springs eleven months before, and that some portion of the stress was applied to the spindle from the time the turbine was first operated. But he found that until the No. 2 bearing was affected by the stress "there was no stress on the spindle." His report shows that this stage in the history of the stress was not reached until a matter of hours before the spindle was finally taken out of commission. The turbines at the New Bedford plant were inspected daily for undue vibration, but there is nothing in the report indicating that any such vibration was detected before the morning of June 9. This turbine operated on June 6, 1947, up to about its full capacity of 20,000 kilowatts. When it finished its work on this date it was put on a turning gear over the week end for the purpose of making tests and inspections of the generator leads and adjustments to the boiler. No other purpose appears in the auditor's report. The first indication of any unusual vibration occurred about 7 A.M. on June 9, 1947, when the turbine was brought up to full speed and put into service. The vibration became more pronounced at 10 A.M. The turbine became violently rough at 1:15 P.M. and it was therefore necessary to shut it down at 2:34 P.M.

The words "sudden and accidental" modify the terms "breaking, deforming . . . or rupturing . . . which immediately impairs the functions of the Object." They describe a result and they do not refer to any means by which that result has been brought about. The risk covered by the policy was not confined to damage caused by accidental means. The tenor of the auditor's report furnishes persuasive evidence that he treated the policy as if it covered only losses arising out of some sudden or accidental cause instead of determining whether the actual cracking itself was sudden and accidental. His finding, that the only human effort which could be considered in the nature of an accident was the missetting of the springs almost a year before the breaking of the spindle, only confirms our conviction that he has too narrowly construed the policy. The coverage was not limited to accidental means

as distinguished from accidental results as was the coverage in *Smith* v. *Travelers Ins. Co.* 219 Mass. 147, *Henderson* v. *Travelers Ins. Co.* 262 Mass. 522, *Kramer* v. *New York Life Ins. Co.* 293 Mass. 440, and *Ballam* v. *Metropolitan Life Ins. Co.* 295 Mass. 411.

Even if the improper adjustment of the springs was the only human effort in the nature of an accident, that fact did not bring the damage to the spindle outside of the coverage of the policy. Although the setting of the springs was done voluntarily and knowingly by those who set them, they did not do so with any deliberate purpose or intent to damage the turbine. Compare *Sontag* v. *Galer*, 279 Mass. 309, 312, 313. The fact is that they did not know that they had improperly set the springs, much less that the turbine might be damaged. Even if the act of setting the springs constituted negligence, that would not aid the defendant. *Johnson* v. *Berkshire Mutual Fire Ins. Co.* 4 Allen, 388. *Todd* v. *Traders & Mechanics Ins. Co.* 230 Mass. 595. The missetting of the springs was latent and could only be discovered by measuring them with a caliper and comparing the measurements with the drawings. The plaintiffs were ignorant of any error in the adjustment of the springs until after the damage to the spindle. The auditor found that the damage was not due to the fault or negligence of the plaintiffs or of Westinghouse. In view of the categorical finding "that no cause for the cracking of the shaft [spindle] occurred other than the incorrect setting of the condenser springs," it is difficult to see how the damage to the spindle could be reasonably anticipated. We draw an inference to the contrary. The finding that the damage was inevitable means no more than that damage would result unless the latent defect due to the missetting of the springs was discovered and corrected before the stress increased in such intensity as to damage the spindle.

The term accident, unlimited except by the word sudden, should be given its ordinary meaning as denoting an unexpected, undesigned, and unintended happening or a mishap and as including an event which, according to the

common understanding of people in general, would rightly be considered as an accident. *Dow* v. *United States Fidelity & Guaranty Co.* 297 Mass. 34, 38. *Sheehan* v. *Goriansky*, 321 Mass. 200, 205. Indeed, under a policy phrased as the instant one was, it was held that "In determining the meaning of the term 'accident,' as used in this policy, the question is not what it might mean to a scientist or one skilled in the subject involved, but what it means to the average man . . . the words 'accident' and 'accidental' should be given the meaning they impart in common speech." *Ocean Accident & Guarantee Corp. Ltd.* v. *Penick & Ford Ltd. Inc.* 101 Fed. (2d) 493, 497. It was said in *H. P. Hood & Sons* v. *Maryland Casualty Co.* 206 Mass. 223, 226, where the language of the policy was "bodily injuries accidentally suffered," that "It hardly could be broader. . . . Any accident that causes bodily injury in any way is included." We think that the cracking of the spindle was just as much an accident as was the breaking of the chassis of a loaded truck (at a place where it had been previously broken a number of times) as it was being driven over a road pitted with holes, *Terrien* v. *Pawtucket Mutual Fire Ins. Co.* 96 N. H. 182, or the misthreading of an oil supply pipe in cleaning the heater in a dwelling which caused the destruction of the house, *General Casualty Co.* v. *Larson*, 196 Fed. (2d) 170, or the application of a solution containing hydrofluoric acid used in cleaning the outside of a building where some of the solution spattered against the windows and etched and damaged them. *Cross* v. *Zurich General Accident & Liability Ins. Co.* 184 Fed. (2d) 609.

Besides being accidental the damage to the spindle must be sudden. The cause, however, need not be sudden. It is enough if the mechanical breakdown itself is sudden. The distinction is pointed out in *Detroit Lakes* v. *Travelers Indemnity Co.* 201 Minn. 26, where the insuring clause was nearly identical with the one in the instant policy and where the question was whether the rupturing of a 1,700 pound casting of a turbine steam engine was sudden. It was said at page 28 that, "Although the factors of causa-

tion may have been gradual and even slow in operation, the rupturing itself doubtless was sudden, at least in its beginning. Anyway, the jury was easily within the ambit of reasonable inference in so finding." In *Cornell Wood Products Co.* v. *Hartford Steam Boiler Inspection & Ins. Co.* 62 Fed. Sup. 303, the electrical equipment was damaged by a flood. The wedges on one of the generators were swollen and therefore ineffective. It was said that the swelling resulted from 60 hours' submersion in the water and could not be regarded as sudden or accidental.

The turbine had become violently rough at 1:15 P.M. and so continued until it was shut down about an hour and fifteen minutes later. It would be hard to infer that the spindle, at least during this last mentioned period, was merely undergoing only slow and gradual structural changes, especially in view of its condition as shown by the subsequent examination. We do not agree with the auditor's inference that the cracking of the spindle was gradual and not sudden.

If we lay to one side any idea of the rapidity or quickness in the actual cracking of the spindle and give to the term sudden its primary meaning according to the lexicographers as a happening without previous notice or with very brief notice, or as something coming or occurring unexpectedly, unforeseen, or unprepared for, then the cracking of the spindle comes within this concept of the word, for it is plain from the report of the auditor that the mechanical defect which caused the cracking arose through no fault and even without the negligence of the insured, and that the latter had no knowledge of the existence of the defect, much less any reason to anticipate that it would cause damage to the turbine. In fact, no one knew the cause of the damage until after the spindle had been replaced. The damage to the spindle could not be reasonably anticipated, and its occurrence was unexpected and unforeseen and consequently sudden in the ordinary meaning of the word.

It is too plain for argument that the damage to the spindle immediately impaired its function and necessitated

330 Mass. 640                                           655

New England Gas & Electric Assoc. *v*. Ocean Accident & Guarantee Corp. Ltd.

its replacement in accordance with the terms of the policy. *Ocean Accident & Guarantee Corp. Ltd.* v. *Penick & Ford, Ltd. Inc.* 101 Fed. (2d) 493, 497–498. *Tennant* v. *Hartford Steam Boiler Inspection & Ins. Co.* 351 Pa. 102, 106–108.

It therefore follows that the damage to the spindle came within the sudden and accidental type of injury defined by the policy.

The defendant contends that the only conduct that could be considered as an accident was the missetting of the springs in July, 1946, nearly nine months before the term of the policy began, which resulted in the damage to the spindle on June 9, 1947, and that this did not bring the happening to the spindle within the period of the policy. An injury arising from the use of property during the term of the policy is not removed from the risk insured merely because the condition which caused the injury antedated the policy. *George W. Deer & Son* v. *Employers Indemnity Corp.* 77 Fed. (2d) 175. *Export Steamship Corp.* v. *American Ins. Co.* 106 Fed. (2d) 9. *Tulare County Power Co.* v. *Pacific Surety Co.* 43 Cal. App. 315. *Farmers Cooperative Society No. 1* v. *Maryland Casualty Co.* 135 S. W. (2d) 1033 (Tex. Civ. App.).

The defendant contends that the No. 1 turbine was never included in the coverage. It relies upon *Edward Rose Co.* v. *Globe & Rutgers Fire Ins. Co.* 262 Mass. 469. In that case a bale of cotton waste containing a spark which had become imbedded in it as it passed through a machine was included in each of three shipments of waste at the time the bales were placed in freight cars and the transportation began. This was the time when the term of fire insurance on those shipments commenced. At that time, neither the insured nor the insurer knew that a part of the shipment was on fire. The fires from these bales damaged the rest of the waste. The court, after pointing out that the property was actually on fire at the commencement of the term stated in the policy, stated that it could not be said that the parties contemplated that the policies should take effect in such circumstances; that the situation was analogous to

one where the subject matter of a contract was not in existence; that for all practical purposes a carload of highly inflammable cotton waste on fire could have no sale value; and that, if the existence of fire had been known, it could not be thought that a policy would have been issued. We think that case is distinguishable from the instant case. The danger in the case cited was immediate, present, and real, and the actual burning of a part of the shipments had already begun. In the case at bar the danger was more remote and potential. It did not begin the actual impairment of the turbine resulting in the replacement of the spindle until nearly a year after the missetting of the springs when it suddenly became a great destructive force. That was two months after the policy term began. Up to June 9, 1947, an adjustment of the springs would have eliminated all danger then lurking in the situation. The turbine had not become worthless because of this situation. The fact that the insured would not have requested insurance on the turbine and the insurer would not have issued a policy upon it if they had known that the springs were not properly set and damage to the turbine might result has not the persuasive force and effect of the similar fact stated in the opinion in the *Rose* case where the subject matter of the insurance was actually on fire at the beginning of the policy. Here the functions of the turbine were not being directly impaired to any appreciable extent when the old policy was extended by a rider on April 9, 1947, for thirty days and was extended thereafter until a new policy was issued and accepted by the insured on October 30, 1947, and dated back to April 9, 1947. In the next place, a risk of loss by fire to cotton waste is different from a risk of loss from mechanical breakdown of electrical turbines where defects may appear at the commencement of or at any time during their operation. The insurer reserved the right to inspect the turbines from time to time and "Upon the discovery of a dangerous condition" to "immediately suspend the insurance thereon by written notice." About the date when No. 1 turbine was completely assembled lacking certain

bus connections and safety devices, an inspection was made by one of the insurer's engineers in the usual course of his duties and a report filed with the insurer. Periodic inspections followed by one of the insurer's engineers. This right to inspection was for the benefit of the insurer, and while there is nothing in the report to show that the insurer assumed the matter of inspection as a duty owed the insured as there was in *Hartford Steam Boiler Inspection & Ins. Co.* v. *Pabst Brewing Co.* 201 Fed. 617, and *Van Winkle* v. *American Steam Boiler Co.* 23 Vroom, 240, the reservation of the right to inspection tended to show that the insurer contemplated a possibility at least that the turbine might not be in perfect mechanical condition and that inspections were necessary to protect the insurer.

The doctrine of implied warranty as to the seaworthiness of a vessel at the commencement of the risk in force in marine insurance is not to be readily extended to other branches of insurance. *Springfield Fire & Marine Ins. Co.* v. *National Fire Ins. Co.* 51 Fed. (2d) 714, 719. *Walker* v. *Fireman's Fund Ins. Co.* 114 Ore. 545. The fact that there was a latent defect in a boiler did not bar recovery against the insurer in *First National Bank* v. *Royal Indemnity Co.* 193 Iowa, 221.

The policy provided for the payment to the insured "for loss on the property of the Assured directly damaged by such Accident" with certain exceptions including "(e) loss from any indirect result of an accident." The contract of insurance was one of indemnity and the insured were entitled to be put in the same condition pecuniarily as if the property had not been damaged. *Kingsley* v. *Spofford*, 298 Mass. 469, 474–477. The reasonable cost of replacing the spindle if a charge had been billed by Westinghouse to New Bedford would have been $87,876.77. Westinghouse made no charge and attorneys for the insured stated to the auditor in open court that it might be assumed by him that none would be made although there was no express agreement between Westinghouse and New Bedford. We do not know

what motivated Westinghouse in its failure to bill New Bedford. It might intend to make a gift, to protect or enhance its reputation in the trade, or it might eventually decide to charge New Bedford. We do not think New Bedford should be required to take the risk on what Westinghouse might do. Suppose Westinghouse never makes a charge to New Bedford. This does not free the insurer from its liability to pay New Bedford the cost of replacing the spindle. It was said in *Haley* v. *Manufacturers' Fire & Marine Ins. Co.* 120 Mass. 292, 297, "That the occurrence of the loss may either, because of the existence of collateral contracts, or because of the abandonment of such contracts, indirectly give to the insured an advantage, does not concern the insurer. He does no more than indemnify the insured according to his policy if he pays no more than the value of the property destroyed, the sum insured upon it and the interest of the insured at the time of the loss." See *Washington Mills Emery Manuf. Co.* v. *Weymouth & Braintree Mutual Fire Ins. Co.* 135 Mass. 503. See also *International Trust Co.* v. *Boardman,* 149 Mass. 158, 161, allowing mortgagees to collect in full for their own use the proceeds of fire policies without accounting to the mortgagors before the statute, G. L. (Ter. Ed.) c. 175, § 99,[1] gave the insurer the right to an assignment of the mortgage. That the damage from a fire was repaired by a third party without any expense to an insured or that a purchaser paid for a parcel of real estate after a house thereon was damaged by fire the same price he agreed to pay before the fire does not diminish the liability of the insurer to pay for the value of the property destroyed or damaged. *Banner Laundry Co.* v. *Great Eastern Casualty Co.* 148 Minn. 29. *Foley* v. *Manufacturers & Builders' Fire Ins. Co.* 152 N. Y. 131. *Alexandra Restaurant, Inc.* v. *New Hampshire Ins. Co.* 272 App. Div. (N. Y.) 346, affirmed 297 N. Y. 858. *Dubin Paper Co.* v. *Insurance Co. of North America,* 361 Pa. 68. *Heidisch* v. *Globe & Republic Ins. Co.* 368 Pa. 602.

---

[1] See amendment St. 1951, c. 478, § 1.

330 Mass. 640                                    659

New England Gas & Electric Assoc. *v.* Ocean Accident & Guarantee Corp. Ltd.

The insurer contends that it is entitled to be subrogated to the rights of New Bedford against Westinghouse. The latter had sold the turbine to New Bedford. The contract of sale is before us as an exhibit. Although the auditor has found that the cracking of the spindle was not due to the fault or negligence of Westinghouse, Westinghouse is not a party to this action and is neither bound by, nor can it take advantage of, that finding. *Lonnqvist* v. *Lammi*, 242 Mass. 574, 578. *Pesce* v. *Brecher*, 302 Mass. 211. *Williams* v. *Investors Syndicate*, 327 Mass. 124. The general rule is well established that upon the payment of a loss the insurer is entitled to be subrogated pro tanto to any right of action which the insured may have against a third person whose negligence or wrong caused the loss.[1] *Stevens* v. *Stewart-Warner Speedometer Corp.* 223 Mass. 44. *Phoenix Ins. Co.* v. *Erie & Western Transportation Co.* 117 U. S. 312. *St. Louis, Iron Mountain & Southern Railway* v. *Commercial Union Ins. Co.* 139 U. S. 223. *Hamilton Fire Ins. Co.* v. *Greger*, 246 N. Y. 162. *Illinois Automobile Ins. Exchange* v. *Braun*, 280 Pa. 550. *Frederick* v. *Great Northern Railway*, 207 Wis. 234. The policy recognized this rule and expressly provided that the insurer "shall be subrogated in case of payment of loss under this policy." The insurer has failed to make any payment and it will be time enough to discuss its rights under the policy as to subrogation when payment has been made. New Bedford has not elected to pursue any claim against Westinghouse, *Hart* v. *Western Rail Road*, 13 Met. 99, and neither has it done anything that has destroyed or damaged the insurer's right to subrogation. *American Surety Co.* v. *Greek Catholic Union*, 284 U. S. 563. Whatever rights the insurer may have stand unimpaired and unaffected by anything done by the insured.

After the damage to the spindle New Bedford leased, made necessary changes in, and operated a street railway generating station, and set up additional transformers to enable Brockton Edison Company to supply more current

---

[1] As to fire insurance see G. L. (Ter. Ed.) c. 175, § 99, as appearing in St. 1951, c. 478, § 1.

to Plymouth. New Bedford also expended a large amount for fuel in excess of that which it would have expended if the No. 1 turbine had continued in service from June 9, 1947, to November 3, 1947. Plymouth ceased to supply current to a cordage plant which thereafter used its own generating machinery in manufacturing electricity for its own needs. Plymouth purchased a large amount of current from Brockton Edison Company at a cost in excess of what it would have paid if it had not been prevented by the breaking of the spindle from continuing to purchase the bulk of electricity from New Bedford. Cape had a small standby plant which it did not contemplate operating and which it was required to operate because of the breaking of the spindle, and it incurred a cost in addition to that which it would have incurred if it had secured all its current from New Bedford. These claims we have grouped together and we shall presently discuss them under the heading of "Miscellaneous Items."

## Use and Occupancy Insurance.

By the use and occupancy indorsement 6A, the insurer agreed to pay a daily indemnity of $11,000 for each day of total prevention of business on the premises described as power generating and distributing plants of New Bedford, Plymouth and Cape "caused solely by an Accident," "and to pay the Assured a part of the Daily Indemnity for Partial Prevention of Business on the Premises, so caused," subject to a limit of loss of $2,090,000. This indorsement provided for four different kinds of business — production, sales, rents, and income — with a definition for each kind. It stated that business here covered was "Production" which "shall mean the production on the Premises of the finished product ready for packing, shipment or sale." In accordance with another provision in the indorsement to determine "Current Business," New Bedford selected its output for April 30, May 1 and May 2, 1947, the net average production of electricity by New Bedford for these

three days being 1,377,460 kilowatt hours. Partial prevention of business was a reduction in business on the premises less than the current business, and the amount to be paid for daily partial prevention of business was that proportion of $11,000 which the reduction bore to the current business. This method furnished the parties with a constant standard to ascertain whether there was a loss in the business and, if so, the value of such loss.

New Bedford paid the insurer eight elevenths, Plymouth one eleventh, and Cape two elevenths of the premium charged under this indorsement. The purpose of this kind of insurance is to pay the insured for the loss which he sustains by reason of being totally or partially deprived of the use of his commercial property. Many use and occupancy policies base the amount to be paid, in case of loss, upon the net profits that the business would have earned if it had not been interrupted by damage to the plant, together with the fixed charges necessarily incurred during the suspension of the business. The indorsement in the case at bar provides for the selection of a standard of the capacity of the plant before it was damaged and provides for the payment of indemnity for reduction in that capacity due to the damage. It is not directly concerned with profits and fixed charges but is concerned with production before and after the damage. Both types of policies carry a limitation as to amounts to be paid and a limitation of the period for which payment is to be made.[1] New Bedford was entitled to a daily indemnity for every day during which its net daily production was less than 1,377,460 kilowatt hours, provided the reduction was due solely to the cracking of the spindle, during the period the

---

[1] *Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co.* 4 Fed. (2d) 835. *Hutchings* v. *Caledonian Ins. Co.* 52 Fed. (2d) 744. *Fidelity-Phenix Fire Ins. Co.* v. *Benedict Coal Corp.* 64 Fed. (2d) 347. *National Union Fire Ins. Co.* v. *Anderson-Prichard Oil Corp.* 141 Fed. (2d) 443. *General Ins. Co.* v. *Pathfinder Petroleum Co.* 145 Fed. (2d) 368. *Home Ins. Co.* v. *Eisenson,* 181 Fed. (2d) 416. *Hawkinson Tread Tire Service Co.* v. *Indiana Lumbermens Mutual Ins. Co.* 362 Mo. 823. *Studley Box & Lumber Co.* v. *National Fire Ins. Co.* 85 N. H. 96. *Michael* v. *Prussian National Ins. Co.* 171 N. Y. 25. *Nusbaum* v. *Hartford Fire Ins. Co.* 276 Pa. 526. *Goetz* v. *Hartford Fire Ins. Co.* 193 Wis. 638.

No. 1 turbine was out of service while the damaged spindle was replaced.[1]

It is to be noted that in ascertaining the output of the New Bedford plant on the three days selected, which furnished the standard for determining the daily indemnity, the No. 1 turbine was not in operation. On those days the six other turbines were manufacturing a net average of 1,377,460 kilowatt hours. They continued to operate while a new spindle was being substituted for the damaged one. The insured point out that electricity unlike other commodities cannot be manufactured and stored but must be produced and be available when a customer desires to use it. Production cannot be maintained at a uniform rate throughout any day but must be maintained at various rates to correspond with the demands of the customers. The plant according to the insured must be capable of sustaining the peak loads during the periods of the day when the demands are greatest. There was testimony briefly stated in the report which tended to show that before or after June 9, 1947, and up to the time the new spindle was put in service on November 3, 1947, the six turbines were able to meet whatever peak loads were needed. Furthermore, these six turbines on the days selected to determine the current business were carrying the required peaks which averaged about 80,000 kilowatts. Although New Bedford had the equipment to produce electricity equal to the volume of current business, it produced less than this amount on all days except eight during the period that the spindle was being replaced. It was obligated by the policy to adopt all reasonable measures to minimize the loss. It accordingly reduced the amount supplied to Plymouth and secured electricity from the street railway plant in order to see that its customers were supplied. Doubtless, cutting down on the amount furnished Plymouth by 11,211,999 kilowatt hours less than it would have otherwise supplied reduced the load which would have been imposed on the New Bed-

[1] There is no contention that the time for the manufacture and instalment of the new spindle was unreasonable.

ford plant. The insurer knew of but never assented to this arrangement with Plymouth which involved increased purchases from Brockton Edison Company by Plymouth. Plymouth could not hold the insurer liable for any increased costs in these purchases as will be later explained. It would be strange if Plymouth could not recover for this item, that New Bedford could recover under the daily partial indemnity for loss of the Plymouth business when it seems that the loss was not caused by the accident to the No. 1 turbine. New Bedford cannot complain of a reduction of business due to its directing business to another electrical company if New Bedford had the equipment adequate to do this business.

In any event, the auditor found that the sole reason 1,377,460 kilowatt hours of useful electricity were not generated by New Bedford on any day between June 9, 1947, and November 3, 1947, when that amount was not generated for distribution to the general public was the lack of demand for this quantity. We see no reason to disturb that finding. It is decisive upon the claim of New Bedford under the use and occupancy indorsement which did not require the payment of partial daily indemnity where the production of electricity was less than current business as fixed by the quantity last mentioned unless such reduction was due solely to the accident of June 9, 1947. New Bedford failed to prove that its daily capacity was reduced to less than 1,377,460 kilowatt hours of electricity due entirely to the cracking of the spindle.

Plymouth and Cape were not entitled to recover for daily partial prevention of business. Plymouth was engaged in the purchase, distribution, and sale of electricity. It did not generate any current. It is at least doubtful whether Plymouth's business was production as defined in the indorsement and as therein carefully differentiated from the other three kinds of business as we have already pointed out. If we assume, without deciding, that the business conducted by Plymouth came within the coverage and that it would be entitled in the circumstances, on account of partial prevention of its business, to share in the daily par-

tial indemnity (although the indorsement made no proportion in which it, New Bedford and Cape should share), any claim to share stems from a reduction of business due to the mechanical breakdown of No. 1 turbine upon the premises of New Bedford.  Plymouth and Cape in order to share would have to prove that daily production by New Bedford below 1,377,460 kilowatt hours, the standard fixed for current business, was caused solely by the breakdown. The sole reason for lack of production by New Bedford was the want of demand.  This was not an event which was insured against in favor of New Bedford, Plymouth or Cape.

## Miscellaneous Items.

The nature of these claims has already been mentioned. None of them can be recovered under a clause insuring against loss to property directly damaged by an accident and expressly excluding losses indirectly resulting from such damage.  The damage sustained by the turbine is the measure of damages, and an incidental loss resulting therefrom such as "interruption of business, loss of profits or even loss of rents" cannot be recovered.[1]  *Hewins* v. *London Assurance Corp.* 184 Mass. 177, 179.  *St. Paul Fire & Marine Ins. Co.* v. *Johnson*, 77 Ill. 598, 602.  *Barney* v. *Maryland Ins. Co.* 5 Har. & J. 139.  *Farmers Mutual Ins. Co.* v. *New Holland Turnpike Co.* 122 Pa. 37.  *Connecticut Fire Ins. Co.* v. *W. H. Roberts Lumber Co.* 119 Va. 479.  *American Employers' Ins. Co.* v. *Peter Gengler Co.* 43 S. W. (2d) 964 (Tex. Civ. App.).  Neither can there be any recovery under the use and occupancy indorsement.  Under another provision, the insurer could by a written direction require the insured to use finished material purchased elsewhere to substitute for the business prevented, and any expense incurred would be included as a part of the loss.  Plymouth and Cape never made any request for such a direction and the two requests

---

[1] As to loss under a fire policy see G. L. (Ter. Ed.) c. 175, § 99, as appearing in St. 1951, c. 478, § 1.

of New Bedford were ignored by the insurer. The costs sustained by the insured to accelerate the resumption of business or to lessen any reduction in business were taken upon their own initiative. These arrangements made by the insured to better adjust their electrical system to meet the situation arising from the breakdown of the No. 1 turbine were all made before the denial of liability by the defendant, if that is material, except the supplying of transformers to Plymouth to enable it to get a greater supply from Brockton Edison Company and except that the lease with the street railway company was not executed until July 23, 1947, although the work of connecting that station with the main plant of New Bedford was completed before July 3 or 15, 1947, the dates upon which the insurer denied liability. There can be no recovery for such expenses in the absence of written directions of the insurer. *Ocean Accident & Guarantee Corp. Ltd.* v. *Penick & Ford, Ltd. Inc.* 101 Fed. (2d) 493, 499. This would be so whether the arrangements out of which the expenses arose were entered into before or after the denial of liability because the coverage of the indorsement could not be so extended to include a risk not within its terms. *Palumbo* v. *Metropolitan Life Ins. Co.* 293 Mass. 35, 37–38. The measure of liability was fixed by the daily partial indemnity and that was not based upon any of these items for which payment is sought.

We have considered the various other contentions of the parties, their objections to the auditor's report, the motion to recommit, and the rulings of the trial judge upon them. To discuss them separately would unnecessarily and unreasonably prolong the opinion. Other than the findings that the breaking was gradual and not sudden and that the happening of an accident could be reasonably anticipated, and the general finding for the defendant, we find no error in the report. There was error in allowing the defendant's motion for judgment.

It follows that all the exceptions except those just specially mentioned are overruled, and that the plaintiffs' exception to the ordering of judgment for the defendant is

sustained and judgment is to be entered for the plaintiff
New Bedford for the damage to its turbine in the sum of
$87,876.77 with interest from the date of the writ.

*So ordered.*