DANIEL P. SHAPIRO, trustee,[1] vs. PUBLIC SERVICE MUTUAL
INSURANCE COMPANY.

Norfolk.    November 9, 1984. — April 22, 1985.

Present: PERRETTA, KAPLAN, & WARNER, JJ.

*Insurance,* Comprehensive liability insurance, Pollution exclusion clause,
    Defense of proceeding against insured. *Consumer Protection Act,* In-
    surer, Attorney's fees. *Words,* "Sudden," "Accidental."

An escape of fuel oil from an underground storage tank into surrounding
    waterways was "sudden and accidental," so as to come within an excep-
    tion to the pollution exclusion clause of the comprehensive liability
    insurance policy held by the owner of the tank. [649-653]
An insurer's breach of its duty under a comprehensive liability insurance
    policy to defend the insured with respect to claims by third parties
    entitled the insured to recover from the insurer his attorney's fees reason-
    ably incurred in defending such claims. [653-656]
In an action against an insurer alleging violations of G. L. c. 93A, § 11, by
    reason of the insurer's failure to settle a claim within the limits of a
    policy of insurance when liability was reasonably clear, the insured was
    not entitled to recover damages, where he failed to show that a causal
    connection existed between the insurer's failure to settle and his claimed
    loss of money due under the policy, and that such loss was foreseeable
    as a result of the failure to settle. [656-657]
Although an insured who proved no loss of money or property was not en-
    titled to damages on his claim against an insurer under G. L. c. 93A,
    he was nevertheless entitled to an award of reasonable attorney's fees,
    where it had been taken as established, by virtue of a judge's imposition
    of an appropriate sanction under Mass.R.Civ.P. 37 (b) (2) (B) on the
    insurer for its failure to produce pertinent documents at the demand of
    the insured, that the insurer committed an unfair or deceptive act declared
    unlawful by c. 93A, § 2. [657-660]

CIVIL ACTION commenced in the Superior Court Department
on July 19, 1979.

---

[1] Shapiro is trustee of the Sapir Realty Trust-Brookline, owner of the
Beacon Hill Gardens (apartments) in Brookline.

The case was heard by *Edith W. Fine, J.*

*Edward J. Shagory* (*Beth Saltzman* with him) for the defendant.

*Mary K. Ryan* (*Craig A. MacDonnell* with her) for the plaintiff.

*Anne Rogers,* Assistant Attorney General, for the Commonwealth, amicus curiae, submitted a brief.

PERRETTA, J. Oil leaked from the plaintiff Shapiro's underground fuel tank and found its way into the surrounding waterways. The Commonwealth, under G. L. c. 21, § 27(14), as appearing in St. 1979, c. 546, § 3, required Shapiro to assume responsibility for cleaning up the spill, a costly endeavor. Shapiro filed a claim under his comprehensive liability insurance policy with the defendant insurer (Public Service). When Public Service disclaimed coverage under the pollution exclusion clause of the policy, Shapiro brought this action, seeking recovery on the policy and alleging violations of G. L. c. 93A, § 11, by reason of Public Service's failure to settle when liability was reasonably clear. See G. L. c. 176D, § 3(9)(*f*). We hold: (1) that Shapiro was entitled to coverage under the policy and to reimbursement for those attorney's fees expended in defending against third-party claims arising out of the oil spill; and (2) that although Shapiro is not entitled to damages on his claim under G. L. c. 93A, as he suffered no loss of money or property, he is nonetheless entitled to attorneys' fees because he established that Public Service had committed an unfair act.

I. *The Policy.*

We recite the facts pertinent to the issue of policy coverage as they appear in the parties' joint stipulation of facts. In February and March, 1979, various State and local officials[2] found oil entering a brook culvert under Beaconsfield Road, Brookline, opposite Shapiro's underground oil tank. The oil had found its way into Leverett Pond and the Muddy River. After investigation, these officials were of opinion that the oil had escaped from the tank and mixed with ground water and

---

[2] Investigators from the division of water pollution control, see G. L. c. 21, § 26, and engineers from the town of Brookline.

that the mixture went through cracks in the culvert under Beaconsfield Road and flowed with runoff water into the pond and river. There is no dispute that the oil found in the culvert, pond, and river came from Shapiro's tank.

Shapiro had the tank emptied and excavated. The tank was corroded from the outside, and an area of the tank, about one foot by two feet, was covered with oil. Oil was found in the ground in an area which corresponded with the oil-covered area of the tank.

In denying coverage under the policy, Public Service relied upon the pollution exclusion clause, which reads in full:

> "This insurance does not apply . . . (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Thus the question: whether the escape of oil from Shapiro's underground tank was "sudden and accidental" within the meaning of the exception to the exclusion.

Relying primarily upon *New England Gas & Elec. Assn.* v. *Ocean Acc. & Guar. Corp.*, 330 Mass. 640 (1953), the trial judge concluded that the escape of oil was sudden, in that it was a "happening without previous notice or with very brief notice . . . coming or occurring unexpectedly, unforeseen, or unprepared for," *id*. at 654, and accidental, that is, "an unexpected, undesigned, and unintended happening or a mishap." *Id*. at 652. Public Service argues that the language of the exclusion is "clear and unambiguous" and that the oil escape was neither "sudden" nor "accidental"; rather, corrosion of the tank was a "natural progressive condition," oil seepage was a "foreseeable consequence of the corrosion," and pollution of the pond and river "occurred over an indeterminate period of time."

The policy provides that: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of "B. property damage to which this insurance applies, caused by an occurrence . . . ." An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured." Thus, it would appear that Shapiro's claim was within the scope of coverage afforded by the policy. See *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. 81 (1984). However, in respect to pollution, coverage is provided only for limited types of occurrences, that is, those which are "sudden and accidental." Those words are not defined in the policy. We do not agree with Public Service's claim that the policy is free from ambiguity. See *Slater* v. *United States Fid. & Guar. Co.,* 379 Mass. 801, 804 (1980). See also *Vappi & Co.* v. *Aetna Cas. & Sur. Co.,* 348 Mass. 427, 431-432 (1965); *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. at 86. Any doubt as to the meaning of the words "sudden and accidental" must, therefore, be resolved against Public Service. See *Woogmaster* v. *Liverpool & London & Globe Ins. Co.,* 312 Mass. 479, 481 (1942).

It does not appear that Massachusetts has had occasion to construe this standard pollution exclusion clause. Numerous jurisdictions presented with this question have concluded that when used in the context of pollution, the words "sudden and accidental" are to be given the same meaning as is ordinary in the area of business liability insurance, i.e., that set out in *New England Gas & Elec. Assn.* v. *Ocean Acc. & Guar. Corp.,* 330 Mass. at 652, 654. See *Reliance Ins. Corp.* v. *Martin,* 126 Ill. App. 3d 94, 97-98 (1984); *Travelers Indem. Co.* v. *Dingwell,* 414 A.2d 220, 224-225 (Me. 1980); *Lansco, Inc.* v. *Department of Environmental Protection,* 138 N.J. Super. 275, 282 (1975); *Jackson Township Mun. Util. Authy.* v. *Hartford Acc. & Indem. Co.,* 186 N.J. Super. 156, 164 (1982); *Allstate Ins. Co.* v. *Klock Oil Co.,* 73 A.D. 2d 486, 488-489 (N.Y. 1980); *Niagara City* v. *Utica Mut. Ins. Co.,* 103 Misc. 2d 814, 820-821 (Sup. Ct. 1980), aff'd, 80 A.D.2d

415 (N.Y. 1981); *Waste Management of Carolinas, Inc.* v. *Peerless Ins. Co.,* 323 S.E. 2d 726 (N.C. App. 1984); *Buckeye Union Ins. Co.* v. *Liberty Solvents & Chem. Co.,* 17 Ohio App. 3d 127, 132-133 (1984); *United Pac. Ins. Co.* v. *Van's Westlake Union,* 34 Wash. App. 708, 714-715 (1983). Although the reasoning in some of these cases varies slightly and insignificantly from that in *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. at 84-86, the conclusions are the same: the well-defined concept of "accident" is "an unexpected happening without intention or design." *Id.* at 83, quoting from *Beacon Textiles Corp.* v. *Employers Mut. Liab. Ins. Co.,* 355 Mass. 643, 645 (1969). See also, *New England Gas & Elec. Assn.* v. *Ocean Acc. & Guar. Corp.,* 330 Mass. at 652. Thus, even were we to view the escape of oil from Shapiro's tank as a foreseeable consequence of an unknown[3] but "natural progressive condition," i.e., corrosion, we would not conclude that the escape was "nonaccidental." See *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. at 86.

Public Service also contends that the joint stipulated facts do not show that the oil spill was "sudden." To be sure, it does not appear that the escape of oil was a "dramatic catastrophe," *CPS Chem. Co.* v. *Continental Ins. Co.,* 189 N.J. Super. 558, 568-569 (1984), but that is not the ordinary meaning of the word "sudden." *Ibid.* See *New England Gas & Elec. Assoc.* v. *Ocean Acc. & Guar. Corp.,* 330 Mass. at 654. See also *Allstate Ins.* v. *Klock Oil Co.,* 73 A.D. 2d at 488 ("[T]he word 'sudden' as used in liability insurance need not be limited to an instantaneous happening").

The interpretation afforded to this pollution exclusion clause by other jurisdictions is entirely consistent with the well estab-

---

[3] Shapiro had the oil tank pumped out and cleaned in September of 1978. At that time he was told that the tank appeared to be in good condition. Compare *Barmet of Indiana, Inc.* v. *Security Ins. Group,* 425 N.E. 2d 201 (Ind. App. 1981), where the insured knew that its pollution control system malfunctioned on a regular and frequent basis and the insured had received numerous complaints concerning its polluting, the discharge of emissions was not sudden and accidental.

lished Massachusetts concept of "accident." The trial judge correctly concluded that the escape of oil was "sudden and accidental" within the meaning of the exception to the exclusion clause.[4]

II. *Counsel Fees.*

After the trial judge concluded that Shapiro's claim was within the exception to the pollution exclusion clause, Shapiro filed a motion seeking an allowance for counsel fees expended in defending himself against third-party claims arising out of the oil spill. The motion was denied, and Shapiro has cross appealed.

a. *Public Service's duty to defend.* Under the terms of its policy, Public Service had the "duty to defend any suit against the insured seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigations and settlement of any claim or suit as it deems expedient . . . ." Public Service's contractual obligation to defend Shapiro against third-party claims is "distinct from and of broader scope than the further obligation to indemnify the insured against judgments obtained against it within the policy coverage." *Sterilite Corp.* v. *Continental Cas. Co.,* 17 Mass. App. Ct. 316, 318 n.4 (1983). If Public Service's refusal to defend Shapiro was a breach of its duty, then Public Service is liable to Shapiro for the reasonable fees incurred by him in his own defense. See *Mandell* v. *Fidelity & Cas. Co.,* 170 Mass. 173, 178 (1898); *Berke Moore Co.* v. *Lumbermens Mut. Cas. Co.,* 345 Mass. 66, 70-72 (1962). See also 14 Rhodes, Couch's Cyclopedia of Insurance Law § 51:61 (2d ed. rev. 1982).

There is nothing to Public Service's argument that its refusal to defend was justified because: (1) the claims against Shapiro "concern[ed] costs and penalties . . . for which Shapiro as a first party claimant was strictly liable"; and (2) the refusal was not wilful in that it was based upon good faith reliance upon the pollution exclusion clause.

---

[4] It is unnecessary to our conclusion to consider the public policy arguments advanced by the Attorney General, as amicus curiae, in support of Shapiro's claim.

b. *The claims.* It appears that there were two claims against Shapiro: a fine in the amount of $1,000, assessed by the United States Coast Guard, and an action by the Commonwealth under G. L. c. 21, § 27(14).[5] We have not been given sufficient information about the nature of the "fine" to consider whether it constitutes a claim within the scope of the duty-to-defend clause of the policy. We note, however, that the trial judge did not include the amount of the fine in the judgment against Public Service. Implicit in the amount of the judgment, then, is a determination that Public Service had no contractual obligation to indemnify Shapiro against the fine. Shapiro makes no argument on appeal that the amount of the fine should have been included in the judgment. Therefore, we will assume without deciding that the fine does not constitute a claim "on account of . . . property damage" against which Public Service had the duty to defend. As to legal fees that might have been incurred on account of the Coast Guard's fine, see note 7, *infra.*

As to the claim made by the Commonwealth, we see nothing that even hints that it was based upon that provision in § 27(14), which allows criminal sanctions "for each day such spillage, seepage or discharge continues." Rather, as we read Shapiro's

---

[5] Section 27(14), as amended through St. 1980, c. 261, § 1A, reads in relevant part: "The division shall determine the person responsible for causing such spillage, seepage or discharge and the names of all persons who owned or controlled the oil . . . or who owned or controlled or leased the . . . tank . . . in which the oil . . . was located when the spillage, seepage or discharge occurred. Said persons shall be jointly and severally liable to the commonwealth for all costs and expenses incurred by the division in making such investigation, and in containing and removing the oil . . . and shall be jointly and severally liable to the commonwealth for all damages done to natural and recreational resources, including all costs of restoring damaged areas to their original condition . . . . The person responsible for causing such spillage, seepage or discharge shall be punished by a fine of not more than ten thousand dollars for each day such spillage, seepage or discharge continues, or by imprisonment for not more than two years or both.

"Upon request of the director [of the division of water pollution control], the attorney general shall bring an action to recover all costs and expenses incurred for such investigation, containment, removal, and restoration.

"Such costs and expenses shall be recovered in an action of tort . . . In any such action the commonwealth may also seek recovery for all loss and damage to the natural and recreational resources of the commonwealth."

complaint, the joint stipulation of facts, and the agreement for judgment between Shapiro and the Commonwealth, the claim was for the costs and expenses incurred by the Commonwealth in investigating and cleaning up the oil spill. Shapiro was liable in tort to the Commonwealth for those costs and expenses. Even if Shapiro assumed full responsibility for the spill, and there is every indication that he did, there remained open the question of the amount of the costs and expenses due the Commonwealth. See, 14 Rhodes, Couch's Cyclopedia of Insurance Law § 51:35, at 444 (2d ed. rev. 1982) ("An insured under a liability policy obligating the insurer to defend actions against him is, even where he has no defense to an action, entitled to the assistance of the insurer upon the issue of damages").

c. *The refusal to defend.* When Public Service notified Shapiro that it was relying upon the pollution exclusion clause and "disclaiming any and all liability to defend this matter," it knew that the Commonwealth was holding Shapiro responsible for cleaning up the spill. Two days after Shapiro received notice of Public Service's refusal, he protested the disclaimer and called Public Service's attention to *Lansco, Inc.* v. *Department of Environmental Protection,* 138 N.J. Super. 275 (1975), wherein the standard pollution exclusion clause had been construed in favor of coverage.

The fact that Public Service did not act "wilfully" is of no consequence. When Public Service refused to defend Shapiro, it took the risk that the escape of oil might be found to be within the exception to the pollution exclusion clause. Compare *Continental Cas. Co.* v. *Gilbane Building Co.,* 391 Mass. 143 (1984), where the insurer sought a declaration that there was no duty to defend. See *Sterilite Corp.* v. *Continental Cas. Co.,* 17 Mass. App. Ct. at 323-324. See also 1 Long, Liability Insurance § 5.02 (1981). It now has been determined that Shapiro's claim fell within the coverage afforded under the policy, and Public Service's refusal to defend was, therefore, unjustified.[6] Accordingly, Public Service is liable for

---

[6] We do not imply that Public Service could not have been found in breach of its duty to defend unless it was also found liable on its policy. See *Sterilite Corp.* v. *Continental Cas. Co.,* 17 Mass. App. Ct. at 324.

those counsel fees incurred by Shapiro in the amount the parties have stipulated to be fair and reasonable.[7]

III. *The Chapter 93A Claim.*

Shapiro's claim under G. L. c. 93A, § 11, is based upon the allegation that Public Service failed to effectuate a prompt settlement of his claim when liability was reasonably clear. See G. L. c. 176D, § 3(9)(*f*). To prove his point, Shapiro sought from Public Service, under Mass.R.Civ.P. 34, 365 Mass. 792 (1974), documents reflecting the manner in which Public Service had acted upon similar claims from other of its insureds over the preceding five years. When Public Service failed to produce those documents, Shapiro sought and obtained an order from a judge (other than the trial judge) that the documents be produced within sixty days or Public Service would suffer "an immediate entry of default."

The documents were not produced per the order, and the matter was brought before another judge for purposes of sanctions under Mass.R.Civ.P. 37(b)(2)(B), 365 Mass. 799 (1974). After hearing arguments of counsel and giving due consideration to the history of the failure to produce, that judge determined that the following sanction against Public Service was an appropriate one: "[I]t is taken as established that if plaintiff is covered under the policy the defendant's failure to effectuate prompt, fair and equitable settlement when liability was reasonably clear was wilful."

Because Public Service was found liable on the policy in the amount of the costs and expenses incurred by Shapiro in cleaning up the spill ($78,656.05) and because Public Service's

---

[7] The stipulation makes no distinction between the two claims against Shapiro, the fine due the Coast Guard and the costs and expenses of the clean-up due the Commonwealth, and there is no apportionment of the fees to the claims. If Public Service had intended to resist full payment of the fees on the basis of a distinction between a fine and a claim on account of property damage, it should have done so from the outset, especially in view of the fact that some nine months prior to the stipulation the trial judge had excluded the amount of the fine from the calculation of the amount owed Shapiro under the policy. We think that in these circumstances it would be unfair to Shapiro to hold Public Service for less than the amount provided for by the stipulation, $9,000.

failure to settle had been established as wilful, the trial judge entered judgment on the c. 93A claim for an additional $78,656.05, and reasonable attorneys fees.[8]

a. *Loss of money or property by Shapiro*. To prevail on his claim under c. 93A, § 11, Shapiro had to show a causal connection between Public Service's failure to settle and the loss of money or property and that such loss was foreseeable as a result of the failure to settle. See *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 850 (1983). Shapiro has shown no causal connection between the failure to settle and the claimed loss of $78,656.05. That figure represents the amount due him under the policy and awarded on the first count of his complaint. Shapiro is not entitled to use that recovery as the basis of an award under § 11. See *DiMarzo* v. *American Mut. Ins. Co.,* 389 Mass. 85, 101-102 (1983). Although it may seem reasonable to assume that Shapiro suffered a loss of money by reason of Public Service's failure to settle, in that he would be required to use his own money to satisfy the Commonwealth's claim pending a determination of the coverage afforded under the policy, he offered no evidence to show the amount of that loss.[9] See also *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 678 (1983).

b. *Attorneys' fees under § 11*. Even though Shapiro must lose his damages award under § 11, it does not follow that he is not entitled to an award of his reasonable attorneys' fees under the statute. As it pertains to attorneys' fees, § 11, inserted by St. 1972, c. 614, § 2, provides: "If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in

---

[8] The parties have stipulated that if attorneys' fees are awarded, $20,000 is a fair and reasonable amount.

[9] We need not consider whether those fees awarded to Shapiro for the reasons discussed in part II of this opinion provide a basis for an award under § 11, because there is nothing to show that he paid the fees and thereby incurred a loss of money. Nor do we consider Public Service's claim under *Dodd* v. *Commercial Union Ins. Co.,* 373 Mass. 72, 81 (1977), that because the policy was issued to the "Estate of Alexander Shapiro," Shapiro has no standing to seek c. 93A damages.

controversy, be awarded reasonable attorneys' fees and costs incurred in said action." Hence, all that need be shown to support an award of counsel fees is that the defendant committed an unfair or deceptive act, irrespective of whether that act caused a loss of money or property. Cf. *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 697-700 (1975).

Whether an unfair act has been shown requires discussion of the sanction imposed against Public Service. Public Service argues that the sanction cannot stand because the "consequences flowing from the . . . [sanction] exceed the bounds of reasonableness." *Henshaw* v. *Travelers Ins. Co.,* 377 Mass. 910, 911 (1979). But, as *Henshaw* teaches, the "bounds of reasonableness" are drawn by the circumstances of the individual case. Compare *Henshaw* with *Partlow* v. *Hertz Corp.,* 370 Mass. 787 (1976).

In imposing the sanction, the judge first considered the history of Public Service's failure to produce the documents. Shapiro requested the documents when he filed his complaint in July, 1979. Public Service's response was due in September. Nothing came from Public Service, and Shapiro, on December 17, 1979, filed a motion to compel. That motion prompted Public Service to respond, in writing, on December 23, 1979, that all documents requested would be produced. Although Public Service did thereafter turn over certain documents to Shapiro, it did not produce the documents that are here at issue. Instead, Public Service assured the court that all the documents had been or would be provided to Shapiro.

That representation was not lived up to, and on March 27, 1980, Shapiro filed another motion to compel and requested costs. That motion was heard on April 3, 1980. At the hearing, Public Service objected to Shapiro's requests, arguing that because of Public Service's record-keeping system, production would be "burdensome" and "impossible."[10] That argument at

---

[10] In its brief, Public Service suggests that the requested documents were not in its possession. To the extent that suggestion differs from "burdensome" and "impossible," we need not consider the argument, which is raised for the first time on appeal.

that stage of the proceedings was apparently found unpersuasive because the judge ordered compliance within sixty days, and further ordered that a failure to produce would result in an "immediate entry of default."

The second factor considered by the judge imposing the sanction was the pertinence of the documents requested. As accurately stated by the judge in his memorandum, Public Service "has exclusive knowledge of the number and amount of claims which concern the way in which the defendant has construed the language of Exclusion F [pollution exclusion] in its policy; Shapiro must rely upon the defendant's proper compliance with the rules of discovery in order to establish a case for the defendant's liability on the Chapter 93A claim that the breach was an unfair or deceptive act, and was done wilfully."

Concluding that sanctions would be appropriate but that a default on the complaint in its entirety would be too harsh, the judge indicated that he would consider limiting a sanction to the issue of "wilfulness" under § 11. When he asked Public Service to argue for alternatives, the response was to allow Shapiro to use depositions or to award him the "cost incurred as a result of the discovery which [Shapiro's counsel] has attempted to make but not been successful with."

The sanction imposed, although not the ultimate, was significant. However, when Public Service's conduct is measured against the pertinence of the requested documents, we cannot say that the sanction imposed "exceed[ed] the bounds of reasonableness." *Henshaw* v. *Travelers Ins. Co.,* 377 Mass. at 911.

The sanction was appropriate in the circumstances and establishes that "there has been a violation of section two." G. L. c. 93A, § 11. Indeed, the trial judge relied upon the order imposing the sanction in awarding double damages and attorneys' fees.[11] The question now becomes whether it is consistent with the intent and purpose of the attorneys' fees provision in § 11 (requiring an award of fees upon a finding of a violation

---

[11] Reliance upon that order by the trial judge was not, as Public Service argues, improper. Cf. *Peterson* v. *Hopson,* 306 Mass. 597, 601 (1940); *Net Realty Holding Trust* v. *Daly,* 14 Mass. App. Ct. 934, 934-935 (1982).

of § 2, cf. *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. at 697-700) to award those fees where the unfair act is established by sanction rather than evidence. The particular sanction here imposed was fashioned to give Shapiro the equivalent of what Public Service would not. To allow Public Service now to defeat an award of counsel fees on the ground that Shapiro did not prove an unfair act would not only vitiate the sanction, it would frustrate a basic purpose of the statute.

IV. *Conclusion.*

The judgment is vacated, and a new judgment is to be entered ordering, as to count 1, that the plaintiff recover from the defendant the sum of $78,656.05, with interest, and $9,000.00, attorney's fees, without interest; as to count 2, that the plaintiff recover from the defendant attorney's fees, for the trial proceedings, in the amount of $20,000.00, without interest and, for the appellate proceedings, in an amount to be determined by a judge of the Superior Court.* See *Patry* v. *Liberty Mobilehome Sales, Inc.*, 394 Mass. 270, 272 (1985). Neither party is to have costs of appeal.

*So ordered.*

---

* Shapiro did not request appellate attorney's fees on his c. 93A claim until after our decision was initially released but before the rescript issued. Public Service opposes the request on the ground that it should have been made earlier. Although we agree that Shapiro should have acted sooner, his delay was not so undue as to justify a refusal of an award on that basis.