Gershengorn, J.
The plaintiff, Spencer Press, Inc. (Spencer Press) brings this action against the defendants, Utica Mutual Insurance Company, et al (Utica). Spencer Press alleges that Utica failed to adequately investigate or manage, and in good faith settle, a claim made by Deerskin Trading Post (Deerskin), a valuable customer of Spencer Press. As a direct result, Spencer Press lost the business of Deerskin. Spencer Press alleges that Utica’s conduct violated both G.L.c. 176D §3, and G.L.c. 93A and seeks treble damages in the amount of $3,856,050. Spencer Press also alleges that after a judgment was entered against Spencer Press, Utica wrongfully refused to indemnify Spencer for the part of the judgment which Spencer Press was ordered to pay Deerskin. Spencer Press alleges that such conduct on the part of Utica constitutes a breach of contract and a violation of G.L.c. 93A, and seeks treble damages with interest in the amount of $506,000.
Utica asserts that Deerskin’s claim was not settled because the extent to which Spencer Press’s negligence caused Deerskin’s losses was never reasonably clear. Further, Utica contends that they refused to indemnify Spencer Press because coverage was not provided under the insurance policy.
*470 PROCEDURAL BACKGROUND
This action arose as a result of Spencer Press’s dissatisfaction with Utica’s handling of the claim made by Deerskin against Spencer Press. The underlying incident, which gave rise to this claim arose when Spencer Press, a commercial printer, manufactured close to 4,000,000 catalogs for Deerskin, a mail order leather goods business. The catalogs were defective in that excess glue bound several pages of the catalogs together and concealed the order form. Deerskin’s sales plummeted. In December of 1981, Deerskin filed a claim against Spencer Press for the damages which it had allegedly sustained as a result of the defective mail order form insert. The claim components consisted of a) lost profits from lost orders in the amount of $726,510.00, b) future income from new customers that were not added to the Deerskin mailing list in the amount of $100,886.00, c) future list rental income from lost updated Deerskin customers, and lost new customers in the amount of $22,927, and d) interest on operating profits.
On July 9, 1984, trial commenced in the Lawrence Superior Court. During trial, the judge allowed Spencer Press’s motion for a directed verdict, in part, and instructed the jury that they were only to consider Deerskin’s direct damages, as opposed to Deerskin’s indirect or consequential damages. The judge’s directed verdict was based upon a limitations of damages clause contained within the initial contract between Deerskin and Spencer Press. The clause had never previously been an issue, primarily because Spencer Press believed that the clause was invalid. The jury awarded Deerskin $175,000 for Spencer Press’^ breach of an implied warranty. The jury also awarded Spencer Press $358,000 on its counterclaim against Deerskin for the balance of the monies owed Spencer Press for publishing the Fall 1980 catalogs.
On appeal, the decision of the Superior Court was affirmed by the Supreme Judicial Court. On September 24, 1986, Spencer Press paid Deerskin the judgment with interest in the amount of $275,568.63. Similarly, Deerskin paid Spencer Press the judgment with interest in the amount of $475,989.71.
FINDINGS OF FACT
Based on all the evidence the court finds to be credible, drawing such fair inferences as the court finds to be reasonable, and resolving questions of credibility where they occur, the court finds the following material facts:
1) Spencer Press is a Massachusetts corporation that has been engaged in the business of commercial printing since 1940. Spencer Press’s products chiefly include mail order catalogs which are distributed for clients on a national basis.
2) In 1980, Deerskin was a Massachusetts corporation which operated a national mail order company buying and selling clothing.
3) Since 1972, Deerskin was one of Spencer Press’s biggest customers.
4) In 1980, Utica provided insurance coverage to Spencer Press. Utica is headquartered in New York with a regional office in Massachusetts.
The Insurance Policy
5) The insurance policy between Utica and Spencer Press provided that Utica would pay all sums which Spencer Press, as insured, would become legally obligated to pay as damages arising out of any negligent act, error or omission which was neither expected nor intended by Spencer Press, and which happened in the course of providing printing services during the policy period.
6) The coverage was subject to a $25,000 retained limit and the liability limit was $25 million. In addition, the following exclusion was contained in the agreement:
This policy does not apply:
(h) with respect to work performed by or on behalf of the insured and with respect to damages or expenses claimed by the named insured.
(1) to any property damage to such work which arises out of any part or portion thereof or out of any materials, parts or equipment furnished in connection therewith . . .
The Glue Problem
7) As of 1980, Deerskin had an extensive catalog mailing program. Four times a year, Deerskin’s catalogs were sent to prospective customers. Since the early 1970s all of Deerskin’s catalogs were printed by Spencer Press. The catalog which gave rise to this litigation is Deerskin’s Fall 1980 catalog which Spencer Press agreed to produce.
8) Spencer Press planned to print the Fall 1980 Deerskin catalog in four stages.
9) During the first stage of the manufacturing process, spots of excess glue were not trimmed off and caused several pages of the catalogs to stick together. In most catalogs the mail order form was hidden from view, stuck between two glued pages (The Glue Problem).
10) Spencer Press failed to discover the glue problem until after the second stage of printing was complete and approximately 4,000,000 copies had been mailed to prospective Deerskin customers.
11) Spencer Press learned of the glue problem only after being notified by Deerskin that business for the first two mailings was far below expectations and that customers who did order merchandise were utilizing stationery other than the official catalog-order form.
12) Deerskin’s projected mail order sales were forecast by a “Sales and Circulation Summary” (Sales Summaries). These statistical Sales Summaries had proven to be an effective method of projecting sales in the past. An individual Sales Summary was prepared *471 for each of the four, separate, Fall 1980 catalog mailings.
13) Upon discovering the nature of the glue problem, Robert Spenlinhauer (Spenlinhauer), treasurer of Spencer Press, and Edmund Nugent (Nugent), president of Deerskin, agreed to change the format of the catalog for the third mailing, so that the order form would be in the clear view of the customer.
14) Spencer Press admitted that the glue problem was caused by its own negligence in the manufacturing process.
15) The third mailing, with the revised order form, closely tracked its budget in the Sales Summary.
16) After realizing that their printing error might have caused Deerskin substantial loss, Spencer Press contacted Utica.
17) In December of 1981, Deerskin made a claim for the damages which it had allegedly sustained as a result of the defective mail order form insert. The claim components consisted of a) lost profits from lost orders in the amount of $726,510.00, b) future income from new customers that were not added to the Deerskin mailing list in the amount of $100,886.00, c) future list rental income from lost updated Deerskin customers, and lost new customers in the amount of $22,927, and d) interest on operating profits.
Utica’s Investigation
18) Upon receipt of the notice of the claim of Deerskin, Utica began an investigation under the direction of Senior Claims Supervisor, Raymond Divone (Divone). Divone reported directly to Utica’s Regional Claims Manager, Harold Lovering (Lovering). Lovering was responsible for the final recommendation regarding Deerskin’s claim.
19) On December 18, 1980, Lovering spoke with the Utica Home Office in regards to a “claim reserve” for the Deerskin claim. A claim reserve is established through a subjective analysis considering probable liability, severity of potential loss and the exposure to Utica’s insured. Lovering set aside $25,000 for Deerskin’s claim reserve.
20) On January 19, 1981, Divone visited Spencer Press and met with Spenlinhauer and other Spencer Press personnel. In his initial report regarding the Deerskin claim, to Alfred Reichenberger of the Utica Home Office, Divone recounted in detail the history of Spencer Press, the volume and nature of its business, and reviewed the extent of Spencer Press’s coverage with Utica. In his report, Divone explained that Utica’s "coverage is afforded under the printer’s errors and omissions endorsement for the loss of business being claimed but not for the product itself, in this case, the catalogs in question.”
21) Divone’s report also explained the nature of the glue problem which was the heart of Deerskin’s claim. However, in Divone’s opinion, “the glue problem was no worse than what is experienced with various magazines and periodicals that are received in people’s homes every day.” Divone speculated that Deerskin’s losses were more likely caused by the poor economy.
22) Also on January 19, 1981, Divone wrote to Spenlinhauer of Spencer Press. Pursuant to that letter, Divone explained the extent of Spencer Press’s insurance coverage and clearly informed Spenlinhauer that “(tlhe coverage afforded in the policy does not provide reimbursement for the cost of the product or work performed by the insured (Spencer Press).” The letter went on to explicitly explain that ”[i]n this instance the product would be the catalogs prepared for the Claimant Deerskin by Spencer Press.”
23) In January of 1981, Utica retained the Casualty Life and Surety Companies Claims Bureau (Claims Bureau) to conduct an independent investigation into Deerskin’s claim.
24) Employees of the Claims Bureau met with Nugent of Deerskin and reviewed Deerskin’s financial records. Due to the complexiiy of the mail order business, the Claims Bureau sought and received permission from Utica to retain the accounting firm of Rosenberg & Eckstein, to analyze Deerskin’s claim.
25) The Claims Bureau also sought out other mail order businesses to determine the general climate of the industry. Representatives from Lawson Hill Shoes, Pepperidge Farms, L.L. Bean, Johnny Appleseeds, and The Talbots were contacted and interviewed concerning the general business climate of the industry. These companies were not direct competitors of Deerskin. None of these companies sold leather goods through the mail. All of these companies agreed that during the fall of 1980 business was soft in the mail order industry.
26) A more extensive analysis was impossible as many companies refused to divulge statistical information in order to protect their business interests.
27) In March of 1981, Utica obtained Dun & Bradstreet’s financial report regarding Deerskin. The report indicated that Deerskin was having financial difficulties.
28) In May of 1981, Utica retained Summit Claim Service, Inc. (Summit) to contact the Direct Mail Market Association and obtain statistics relative to the clothing industry of the mail order business. Summit had no prior experience in the mail order catalog field. Summit investigated and contacted the Direct Mail Market Association but was only able to obtain general estimates of gross sales in the industry.
29) In June of 1981, Rosenberg & Eckstein completed their analysis of the Deerskin claim and concluded that although Deerskin had suffered a decline in sales during the fall of 1980, such a decline could have been caused by extraneous factors including market conditions, the approaching presidential election and style changes.
*472 30) The report of Rosenberg & Eckstein was based upon the overall budgets prepared by Deerskin on an annual basis. The accountants failed to utilize Deerskin’s Sales Summaries which made projections for each catalog mailing, were made immediately prior to the mailing, and were based upon the makeup of the individual mailing lists. Such projections had, in the past, accurately documented the success of individual mailings. The accountants did not rely upon the Sedes Summaries because they believed that the annual reports, prepared by an independent accountant, were more reliable.
The Denial of Deerskin’s Claim
31) In July of 1981, Utica denied Deerskin’s claim.
32) Utica’s decision was based upon their own investigation, the findings of two independent claims firms, and the findings of the accounting firm of Rosenberg & Eckstein. These combined factors led Utica to the conclusion that the glue problem complained of by Deerskin was neither serious nor did it cause Deerskin to incur a monetaiy loss.
33) The final decision to deny was made at a conference at Utica’s home office with the input and recommendation of Harold Lovering.
34) Lovering’s recommendation was based, in part, upon his belief that the glue problem was a “minimal situation.” He erroneously believed that only two thousand of the catalogs suffered from the glue problem. In fact, almost 4,000,000 of the catalogs suffered from the defective glue problem.
35) Lovering testified that although he had seen the Claims Bureau reports he did not rely on any information contained in them in recommending denial.
36) Lovering did not rely on the Dun & Bradstreet reports on Deerskin in recommending denial. He did understand that Deerskin was having financial problems, but that had no bearing on his decision.
37) Lovering admitted at trial that he never actually read the accountants report but only glanced at the report’s conclusion.
38) Lovering refused to allow individuals from Deerskin or Spencer Press access to the accountant report of Rosenberg & Eckstein. If Lovering had granted access, he would have been advised that the accountants report failed to analyze the Sales Summaries of Deerskin.
39) Lovering’s denial of the Deerskin claim was primarily based upon the belief that there was no correlation between Spencer Press’s negligence and the damages claimed by Deerskin. Lovering knew that Spencer Press’s liability to Deerskin was clear but was never convinced that the extent of Deerskin’s damages were caused by Spencer Press’s negligence.
40) In December of 1981, Deerskin initiated suit against Spencer Press. Deerskin’s Complaint alleged breach of contract, breach of warranty and negligence.
41) Utica assumed the defense of Spencer Press but reserved the right to refuse to pay any judgment adjudicated in favor of Deerskin. Utica retained Attorney Fred Pritzker to represent Spencer Press. Attorney Walter May also entered an appearance on behalf of Spencer Press and filed a counterclaim against Deerskin in the amount of $310,504 for the balance due for publishing Deerskin’s Fall 1980 catalogs.
42) On April 13,1982, Spenlinhauer wrote to Lover-ing and objected to the manner in which Utica was treating the Deerskin claim. Spenlinhauer expressed his belief that Utica’s conduct was in violation of G.L.c. 176D. Spenlinhauer further demanded that Spencer Press was entitled to recover $310,000, the amount due for publishing Deerskin’s Fall 1980 catalogs. Spenlinhauer demanded that Utica make no effort to settle Deerskin’s claim without Spencer’s specific consent.
43) Lovering responded with a letter on April 28, 1982, in which he denied the allegations that the claim had not been treated fairly and advised Spenlinhauer in regards to Utica’s reservation of rights with the following language:
Breach of contract as such is not covered, but some of the language of this particular Count of the Complaint is such that it may well be interpreted as to include a breach of an implied warranty of workmanlike performance, which is covered. On the other hand, that portion of the Complaint contained in the First Cause of Action, that pertains to monies paid the Defendant by the Plaintiff would not be covered as the product “itself’ is not covered and any finding or judgment that may issue on behalf of the Plaintiff pertaining to the cost of the catalogs would be your personal responsibility.
44) Also in April of 1982, Utica finally became aware of the fact that the accountants report of Rosenberg & Eckstein failed to make use of Deerskin’s Sales and Circulation Summary reports. The flaw in the report was brought to the attention of Attorney Pritzker by Edward Nugent after Nugent left Deerskin, joined Spencer Press and was granted access to the accountants report.
45) Based upon this development. Attorney Pritzker revised his prediction and advised Lovering and Utica that Spencer Press had no better than a 50% chance of eradicating the claim at trial.
46) On February 10, 1984, Utica’s reserve on Deerskin’s claim was increased to $150,000.
47) Lovering testified that at the time the reserve was increased to $150,000, Spencer Press’s liability to Deerskin was reasonably clear. However, Lovering still did not believe that Deerskin had suffered damage from Spencer Press’s actions.
48) By March of 1984, Deerskin’s final settlement demand was $275,000. Attorney Pritzker was told by Spencer’s counsel that they should not settle *473 Deerskin’s claim without also settling Spencer Press’s counterclaim for $310,000. Pritzker believed that the entire claim could be settled for $500,000.
49) On April 13, 1984, Lovering authored a memorandum to the home office stating:
In my opinion we should go on record with an offer of settlement prior to trial. I doubt an offer would accomplish much, if anything, but would help to alleviate a bad faith situation that could arise should we proceed to trial short of any offer at all. The incurred should be raised in view of our exposure.
50) Also at that time, Lovering recommended a reserve increase to $250,000.
51) By memorandum dated May 2, 1984, Lovering authorized a settlement offer of $25,000.
52) Lovering gave Attorney Pritzker authorization to settle the case for $25,000. This authority was never extended by Pritzker to Deerskin because Pritzker believed such a low figure would not settle the case and could chill any further settlement negotiations.
53) On July 9, 1984, trial commenced in the Lawrence Superior Court.
54) During trial, the Judge allowed Attorney Pritzker’s motion for a directed verdict, in part, and instructed the jury that they were only to consider Deerskin's direct damages, as opposed to Deerskin’s indirect or consequential damages.
55) The judge instructed that direct damages could be awarded on a theory of breach of an implied warranty. The judge’s directed verdict was based upon a limitations of damages clause contained within the initial contract between Deerskin and Spencer Press.
56) The clause had never previously been an issue, primarily because Spencer Press believed that the clause was invalid. In addition, the actual contract between Spencer Press and Deerskin could not be located.
57) The limitations of damages clause was discovered by Spencer Press’s in-house counsel, Scott Stevenson, very close to the trial date. The clause limited Deerskin’s remedy, in the event of a breach, to a purchase price refund.
58) The jury awarded Deerskin $175,000 for Spencer Press's breach of an implied warranty. The jury also awarded Spencer Press $358,000 on its counterclaim for the balance of the monies owed Spencer Press by Deerskin for publishing the Fall 1980 catalogs.
59) On appeal, the decision of the Superior Court was affirmed by the Supreme Judicial Court. Accordingly, on September 24, 1986, Spencer Press paid Deerskin the judgment with interest in the amount of $275,568.63. Similarly, Deerskin paid Spencer Press the judgment with interest in the amount of $475,989.71.
Termination of the Deerskin-Spencer Press Relationship
60) Following Utica’s denial of Deerskin’s claim, Deerskin decided to take its business elsewhere.
61) Edmund Nugent, the president of Deerskin, testified that Deerskin terminated its relationship with Spencer Press because of Utica’s denial of Deerskin’s insurance claim.
62) Spenlinhauer, the treasurer of Spencer Press, testified that new management at Deerskin were not his kind of people and that was one of the reasons for the end of the relationship.
63) Two other lawsuits between Spencer Press and Deerskin were also pending at the time of the suit involving Utica.
Dispute Concerning Coverage
64) On July 24,1984, following tried. Lovering wrote Spenlinhauer and advised him that Utica would not indemnify Spencer Press for the $175,000 which Spencer Press was ordered to pay Deerskin for breach of implied warranty. Utica’s denial was based upon their belief that there was no coverage under the insurance policy for damage to Spencer Press’s work product.
65) On August 23, 1984, Spenlinhauer responded to Lovering and expressed his dismay that Utica was now refusing to pay damages for Spencer Press’s breach of warranty after Utica had explicitly stated, in prior correspondence, that damages for breach of warranty were covered under the policy.
66) Spenlinhauer believed that Lovering had explicitly guaranteed that any breach of warranty was covered under the Utica insurance policy.
DISCUSSION
1) The Insurance Policy Does Not Cover Damage to Work Product
The first issue before the court is whether the Utica insurance policy covers damage to Deerskin’s work product. Second, if coverage is not afforded, Spencer Press alternatively argues that Utica should be es-topped from denying coverage.
Interpretation of an insurance policy presents a question of law for the court. Cody v. Connecticut General Life Ins. Co., 387 Mass. 142, 146 (1982). The principles guiding the court’s interpretation are as follows: (1) an insurance contract must be construed according to the fair and reasonable meaning of its words, Id.; Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass.App.Ct. 318, 323-24 (1991); (2) in construing an insurance policy, it is appropriate to consider what an objectively reasonable insured would expect to be covered, Hazen Paper Co. v. U.S. Fidelity & Guaranty Co., 407 Mass. 689, 700 (1990); (3) exclusions from coverage must be strictly construed against the insurer. Camp Dresser, 30 Mass.App.Ct. at 324; Bates v. John Hancock Mutual Life Ins. Co., 6 *474 Mass.App.Ct. 823, 823 (1978); (4) any ambiguities in the policy provisions are to be resolved against the insurer; Camp Dresser, 30 Mass.App.Ct. at 324; Bates, 6 Mass.App.Ct. at 823; (5) where the terms of an exclusionary clause are unambiguous, they are not construed against the insurer, but are given their ordinary and usual meaning. Barnstable County Mutual Fire Ins. Co. v. Lally, 374 Mass. 602, 605 (1978).
Here, Spencer Press relies upon the following policy language:
This policy does not apply:
(h) with respect to work performed by or on behalf of the insured and with respect to damages or expenses claimed by the named insured.
(1) to any property damage to such work which arises out of any part or portion thereof or out of any materials, parts or equipment furnished in connection therewith . . .
Spencer Press admits that this policy language prohibits them from making a direct claim to Utica for coverage for damage to work product. However, Spencer Press argues that here, the claim for damaged work product is being made by Deerskin and not by Spencer Press. Spencer Press argues that the Utica policy should cover claims, including claims for property damages, made by customers against Spencer Press. The court does not agree.
The clear language of the policy excludes damages for “work performed by or on behalf of the insured” and also excludes “damages or expenses claimed by the named insured.” The exclusion clause prohibits both the named insured and customers of the named insured from making a claim for damage to work product. Where the terms of an exclusionary clause are unambiguous, they are not construed against the insurer, but are given their ordinary and usual meaning. Barnstable County Mutual Fire Ins. Co., 374 Mass. 605. The policy does not cover damage to Spencer Press’s work product.
Utica is Not Estopped From Denying Coverage
Spencer Press alternatively argues that even if the policy does not cover damage to work product, Utica should still be estopped from denying such coverage. In order to estop Utica from denying coverage Spencer Press must establish that Utica: 1) made a representation with the intent to induce Spencer Press to rely upon that representation, 2) Spencer Press reasonably relied upon that representation, and 3) Spencer Press suffered a detriment as a consequence of Utica’s actions. See Royal Globe Ins. Co. v. Craven, 411 Mass. 629, 635 (1992); Jet Line Services, Inc. v. American Employers Ins. Co., 404 Mass. 706, 713 (1989).
Spencer Press contends that the manner in which Utica treated Deerskin’s claim induced them to reasonably assume that the damage to the catalogs was covered under the Utica insurance policy. In support of their estoppel argument, Spencer Press relies upon the Reservation of Rights Letter of April 28, 1982. The letter states:
Breach of contract as such is not covered, but some of the language of this particular Count of the Complaint is such that it may well be interpreted as to include a breach of an implied warranty of workmanlike performance, which is covered. On the other hand, that portion of the Complaint contained in the First Cause of Action, that pertains to monies paid the Defendant by the Plaintiff would not be covered as the product “itselF is not covered and any finding or judgment that may issue on behalf of the Plaintiff pertaining to the cost of the catalogs would be your personal responsibility.
Spencer Press contends that the insurance policy clearly covers damages resulting from a breach of warranty. Claims for breach of warranty are measured by the difference between the value of the goods accepted and the value of the goods as they were warranted. See G.L.c. 106, §2-714(2). As such, Spencer Press contends that the Reservation of Rights Letter led them to reasonably believe that damage to their work product would be covered as a breach of warranty. The court does not agree.
In order to estop Utica from denying coverage for damage to their work product, Spencer Press must establish that they changed their position in reliance upon Utica’s representations and that such reliance was reasonable. Spencer Press fails to carry this burden. Spencer Press offers no evidence to establish that they materially changed their position in reliance upon Utica’s representation. Most important, even if Spencer Press did change their position, such reliance cannot be considered reasonable. Although the Reservation of Rights Letter was ambiguous, Spencer Press cannot claim that the Letter led them to believe that damage to their work product was covered under the policy. The Reservation of Rights Letter explicitly states that “monies paid the Defendant by the Plaintiff would not be covered as the product ‘itself is not covered and any finding or judgment that may issue on behalf of the Plaintiff pertaining to the cost of the catalogs would be your personal responsibility.” Further, it was Utica’s position from the onset of the investigation that any damage to the work product of Spencer Press was not covered. On January 19, 1981, approximately one month after the filing of Deerskin’s claim, Utica’s Ray Divone wrote to Spencer’s Spenlinhauer and clearly informed him that ”[t]he coverage afforded in the policy does not provide reimbursement for the cost of the product or work performed by the insured (Spencer Press)." The letter went on to explicitly explain that ”[i]n this instance the product would be the catalogs prepared for the Claimant Deerskin by Spencer Press."
*475 2) Utica’s Denial of the Deerskin Claim Does Not Violate G.L.c. 93A
An insurer owes a common law duty of good faith to their insureds in the settlement of claims. See Murach v. Mass. Bonding & Ins. Co., 339 Mass. 184, 187 (1959); Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 834 (1st Cir. 1990). “Bad faith” in this context “means something more . . . than failing to make a settlement which a reasonably prudent person exercising due care from the standpoint of the assured would have made.” Abrams v. Factory Mut. Liability Ins. Co., 298 Mass. 141, 145 (1937). The negligent handling of a claim is not enough. Bad faith involves some malicious, fraudulent, or otherwise similarly improper motivation. See, e.g. Hahn v. Planning Board of Stoughton, 403 Mass. 332, 337 (1988), appeal after remand 406 Mass. 1001 (1989). Another benchmark for bad faith would be the violation of any of the provisions of G.L.c. 176D, §(3)(9), either directly or by reference through G.L.c. 93A. General Laws 93A, §2{a) states, in pertinent part, that “(ujnfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” Spencer Press’s claim that G.L.c. 93A, §11, was violated by Utica’s violations of certain provisions of G.L.c. 176D, §3(9), is of significance only to the extent that the alleged wrongful conduct was an unfair or deceptive trade practice. Polaroid Corp. v. The Travelers Indemnity Co., 414 Mass. 747, 754 (1993). General Laws c. 176D, §(3)(9) clarifies which acts or practices are deemed unfair or deceptive when undertaken by persons engaged in the business of insurance. Spencer Press alleges that Utica engaged in acts which violated the following provisions of G.L.c. 176D:
(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(f) Failing to effectuate prompt, fair, and equitable settlements, of claims in which liability has become reasonably clear.
Common Law Duty to Settle in Good Faith
The heart of Spencer Press’s Complaint is that Utica refused to settle the Deerskin claim because Utica was motivated by greed and self interest. Spencer Press contends that Utica’s actions were made in bad faith and caused them substantial harm. Spencer Press’s Complaint focuses on the conduct of Utica Claims Supervisor Harold Lovering.
Lovering’s handling of the Deerskin claim was far from flawless. Lovering failed to grasp that four million of the Deerskin catalogs suffered from the glue problem. All along, Lovering believed that the glue problem affected only two thousand catalogs. Lovering failed to hire a claims agency with prior experience in the mail order catalog business. He failed to closely analyze the report of the claims agency when making his final recommendations. Lovering refused to grant Deerskin or Spencer Press access to the accountants report of Rosenberg & Eckstein. If Lovering had made the report available, he would have learned that the accountants had failed to consider the Sales Summaries that predicted the performance of the individual Fall 1980 catalog mailings. When Lovering realized the Sales Summaries had not been utilized by the accountants, he failed to order a new accounting. Lovering also never fully read the accountants report. His recommendation to deny the Deerskin claim was made after reading only the last page of the report. Lovering further had access to a Dun & Bradstreet report on Spencer Press, but never read the report before making his final recommendation. As litigation proceeded, Lovering sent Spencer Press a Reservation of Rights Letter that was, at best, poorly drafted and confusing. Finally, prior to trial, Lovering issued a memorandum authorizing a settlement offer of $25,000 in order to avoid the appearance of a “bad faith” refusal to settle.
The errors of Harold Lovering are numerous. In particular, Lovering’s attempt to avoid the appearance of bad faith with a token settlement offer is troubling to the court. Let there be no doubt, token efforts of settlement will not satisfy an insurer’s duly to settle in good faith. Token gestures may actually contribute to the factual foundation of a bad faith refusal to settle. However, under the facts of this case, none of Lovering’s miscues rise to a level sufficient to constitute “bad faith.” Harold Lovering, alone, did not make the decision to deny Deerskin’s claim nor to insist on proceeding to litigation. Although Lovering may have made numerous errors, his final decision was based upon the independent and expert opinion of investigators, accountants and counsel. There is no evidence to suggest that any of these individuals suffered from Lovering’s misconception that only two thousand, and not four million of the catalogs, suffered from the “glue problem.” There is no evidence to suggest that any of the following independent individuals were biased or improperly motivated.
First, an investigation by Utica’s Senior Claims Manager Ray Divone was made almost immediately. Divone investigated Deerskin’s claim and concluded that the claim was without merit.
Second, Utica retained the Claims Bureau who interviewed individuals at Deerskin and individuals from numerous mail-order businesses. Businesses including Lawson Hill Shoes, Pepperidge Farms, L.L. Bean, Johnny Appleseeds and The Talbots, were all *476 interviewed. All of these businesses indicated that sales were down in the fall of 1980. Utica then hired the Summit Claim Service, a second independent firm. Summit Claims interviewed individuals from the Direct Mail Market Association, an organization specializing in the mail order business. The conclusions of these two independent claims firms supported Lovering’s belief that Deerskin’s decline in sales was probably caused by economic or political forces wholly unrelated to the glue problem.
Third, Utica retained the independent accounting firm of Rosenberg & Eckstein. The accountants report concluded that although Deerskin had suffered a decline in sales during the fall of 1980, such a decline could have been caused by extraneous factors including market conditions, the approaching presidential election and style changes. The accountants report was based upon the overall budgets prepared by Deerskin on an annual basis. The accountants did not rely upon the Sales and Circulation Summaries because they believed that the annual reports, prepared by an independent accountant, were more reliable than the in-house Sales Summaries.
Finally, Lovering’s continued refusal to settle the Deerskin claim up until the time of trial, was based in large part upon the opinion of Attorney Pritzker who consistently counseled that it was more likely than not that Spencer Press would prevail at trial.
Lovering’s decision, though partially based upon his own mistakes and misconceptions, was primarily influenced by the opinions of independent experts retained to evaluate the Deerskin claim. An insurer who, without any improper motivation, relies on the opinions of counsel and experts in concluding that a claim ought to be defended rather than settled, has not acted in bad faith. Van Dyke v. St Paul Fire and Marine Ins. Co., 388 Mass. 671, 677 (1983). A finding of bad faith requires more than mere negligence. Although Lovering’s mistakes may have been numerous, they do not rise to a level sufficient to give rise to a claim of bad faith.
Utica Did Not Misrepresent Facts or Insurance Provisions Related to Coverage to Spencer Press
Spencer Press contends that Utica violated G.L.c. 176D, §3(9)(a), when Utica refused to indemnify them for damage to their work product. As previously discussed in Part 1, the court does not agree. The plain terms of the policy exclude damage to Spencer Press's work product. As such, Utica’s reliance on the work product exclusion was not a misrepresentation of an insurance provision in violation of G.L.c. 176D.
Utica Adopted Reasonable Standards for the Investigation of Deerskin’s Claim
Spencer Press claims that Utica violated G.L.c. 176D, §3(9)(c) by failing to utilize reasonable standards for the investigation of Deerskin’s claim. The court does not agree.
The Deerskin claim was handled by Utica’s Senior Claims Manager, Ray Divone. Divone began his investigation into Deerskin’s claim almost immediately. Divone visited Spencer Press, toured the facilities, met with Spencer Press personnel and reviewed Deerskin’s claim and Utica’s coverage. Divone clearly communicated to Spenlinhauer and explained the extent of Utica’s coverage. Shortly thereafter, the Claims Bureau was retained to further investigate Deerskin’s claim. Summit Claims was later retained to continue the investigation. Finally, the accounting firm of Rosenberg & Eckstein was retained to determine the validity of Deerskin’s claim of lost sales. Despite Lovering’s characterization that insurance claims were often handled by the “seat of the pants,” the court finds that, in this case, the standards implemented for the investigation of Deerskin’s claim were reasonable.
Utica Denied Deerskin’s Claim After a Reasonable Investigation
Similarly, the claim of Deerskin was not denied until after the completion of a reasonable investigation. As discussed previously, Utica’s Senior Claims Manager, Ray Divone, began his investigation into Deerskin’s claim almost immediately. Divone retained the Claims Bureau and Summit Claims to investigate Deerskin’s claim and retained Rosenberg & Eckstein to determine whether an insured loss had occurred. Neither Divone, the Claims Bureau, Summit Claims, nor Rosenberg & Eckstein had previous experience in the mail order business. However, such a lack of expertise does not invalidate their good faith efforts to investigate Deerskin’s claim. While the investigation could have been more extensive, this does not make the investigation undertaken an unreasonable one. Utica’s ihvestigation into Deerskin’s claim does not constitute a violation of G.L.c. 176D, §3(9)(d).
Utica’s Denial of the Deerskin Claim Was Timely
General Laws c. 176D, §3(9) (e), requires an insurer to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed. Here, Deerskin’s claim was denied on July 1, 1981, approximately seven months after the claim was originally made. In light of the complexity of the mail order business and the fact that the business relies heavily upon statistical information, an accounting was necessary to examine the validity of Deerskin’s claim. The report of Rosenberg & Eckstein was not issued until June of 1981, only one month before Deerskin’s claim was denied. In the interim, Utica retained two independent claim firms to investigate Deerskin’s claim. Under these circumstances, a delay of seven months prior to the denial of a claim is not unreasonable and does not constitute a violation of G.L.c. 176D, §3(9)(e).
The Extent of Spencer Press’s Liability Was Never Reasonably Clear
Spencer Press contends that Utica violated G.L.c. 176D, §3(9)(f) by failing to effectuate a prompt, fair and *477 equitable settlement of Deerskin’s claim after liability became reasonably clear. Spencer Press relies on the numerous admissions of Lovering that at all times, he believed the legal liability of Spencer Press was reasonably clear. The fact that Spencer Press had negligently manufactured almost four million defective Deerskin catalogs was freely admitted by Spencer Press personnel from the outset of the investigation into the Deerskin claim. However, while the existence of liability may have been clear from the onset, the extent of liability was not.
Whether liability is reasonably clear depends not only on the merits, but also upon questions of causation and extent of injuries. See Calderone v. Allstate Insurance Co., No. 90-4949 (Middlesex Sup. Ct., March 10, 1992) (the value of a claim depends not only on the negligence of the insured, but also on questions of causation and the extent of the injuries). See also, Gilleran, The Law of Chapter 93A, Chapter 9, §9:28, supp. pg. 106 (1989 ed & 1992 supp.).
Here, Lovering repeatedly testified that the Deerskin claim was denied because Utica did not believe that the negligence of Spencer Press caused the decline in sales suffered by Deerskin. Lovering did not believe that Deerskin’s claim for lost profits, in the amount of $726,510, was credible. Lovering’s doubt may be, in part, explained by his erroneous belief that only two thousand, and not four million, of the Deerskin catalogs suffered from the glue problem.
Again, if Lovering’s misconception was the sole basis for the denial of Deerskin’s claim, the court would agree that the claim was wrongfully denied. However, the fundamental reason for the denial of the claim was that Deerskin’s damages could not be causally connected to the negligence of Spencer Press. First, Divone who originally investigated the claim reported to Lovering that the glue problem was not serious and Deerskin’s losses were more likely caused by the poor economy. Divone’s belief was supported by the Claims Bureau who interviewed numerous mail order businesses and concluded that sales were down. More support to this theory was provided by the accountant’s report of Rosenberg & Eckstein who concluded that although Deerskin had suffered a decline in sales, such a decline could have been caused by extraneous factors including market conditions, the approaching presidential election and style changes.
Where liability is clear, reasonable, objective minds will not differ. Here, several independent and objective individuals agreed that Deerskin’s losses were likely caused by forces other than Spencer Press’s negligence. Utica’s initial denial of Deerskin’s claim was not a violation of G.L.c. 176D, §3(9)(f).
Further, following the denial of the Deerskin claim, and up until the time of trial, Utica made no offer of settlement. Spencer Press contends that Utica’s failure to attempt to settle the case prior to trial, when liability was reasonably clear, constitutes a further violation of G.L.c. 176D, §3(9)(f). Again, the fact that Spencer Press negligently manufactured the Deerskin catalogs was clear from the onset. However, whether Spencer Press’s actions caused Deerskin’s decline in sales was still not clear as Deerskin’s claim approached litigation. Further, following the denial of Deerskin’s claim, Utica retained Attorney Pritzker to represent Spencer Press. All along, Attorney Pritzker advised Utica that the Deerskin claim would more than likely be totally eradicated at trial. As late as January 24, 1984, Attorney Pritzker believed that Spencer Press had a 75-80% chance of prevailing at trial. By February of 1984, Attorney Pritzker revised this prediction, but still believed that Spencer Press had a 50% chance of totally prevailing against Deerskin at trial.
An insurer who relies on the opinions of counsel in concluding that a claim ought to be defended rather than settled has not acted in bad faith. Van Dyke v. St Paul Fire and Marine Ins. Co., 388 Mass. at 677; Whitney v. Continental Ins. Co., 595 F.Supp. 939, 947 (D.Mass 1984).
Finally, any attempt to settle the Deerskin claim was chilled by the counterclaim of Spencer Press against Deerskin for the balance outstanding on the Fall 1980 catalogs in the amount of $310,000. In a letter of April 13, 1982, Spenlinhauer adamantly states that he suspected Utica would attempt to settle the Deerskin claim without regard to Spencer Press’s counterclaim. Spenlinhauer unequivocally demanded that Utica refrain from any settlement with Deerskin without the specific consent and input of Spencer Press. At the time of this letter, Deerskin had expressed a final demand of $275,000. However, Attorney Pritzker interpreted this to mean that Deerskin’s final demand of $275,000 was net of Spencer Press’s counterclaim of $310,000. In other words, Attorney Pritzker believed that Deerskin would not settle the lawsuit for less than $585,000. Utica was not willing to settle for this amount. Spencer Press adamantly denies demanding that Utica satisfy their counterclaim. In any event, the confusion caused by Spencer Press’s counterclaim had a chilling effect on settlement negotiations.
3) Spencer Press Fails to Prove that Utica’s Actions Resulted in Harm
General Laws c. 93A, §11 governs disputes between business entities. This section requires proof of the loss of money in order for damages to be recoverable. See G.L.c. 93A, §11 (para. 1); Kerlinsky v. Fidelity & Deposit Co. of Maryland, 690 F.Supp 1112, 1120 (D.Mass. 1987). In order to prevail, the plaintiff must show a causal connection between the insurer’s refusal to settle and the loss of money or properly. Shapiro v. Public Service Mut. Ins. Co., 19 Mass.App.Ct. 648, 657 (1985).
*478 Here, Spencer Press claims that Utica’s refusal to settle Deerskin’s claim destroyed business relations between Spencer Press and Deerskin. As a result, Deerskin opted to take their business elsewhere. Spencer Press seeks damages in the amount of lost profits plus interest from the Deerskin account. Spencer Press, however, has failed to persuade the court that it was Utica’s actions, and not other factors discussed above, including Spencer’s own position taken during negotiations, that caused the deterioration of the Spencer Press/Deerskin relationship.
CONCLUSION
Spencer Press’s belief that the damage to their catalogs was covered under the Utica policy was erroneous. The policy clearly excludes damage to work product. Utica is not estopped from denying such coverage because they clearly communicated to Spencer Press from the onset of the investigation that damage to their catalogs was not covered.
Harold Lovering’s handling of the Deerskin claim was far from flawless. Most egregious was Lovering’s belief that the glue problem afflicted two thousand and not approximately four million catalogs. However, despite Lovering’s mistaken impression, he did order an independent, objective investigation by two claims agencies and an accounting firm and the final decision to deny the Deerskin claim was predominantly based upon their findings. Further, Utica’s continued refusal to settle the Deerskin claim as trial approached was predominantly based upon the opinion of counsel who repeatedly assured Utica that Spencer Press had a reasonable prospect of success at trial. Utica’s investigation into the Deerskin claim was timely and adequate. Utica’s denial of the Deerskin claim was made in reliance upon independent experts and legal counsel. As such, Utica did not violate G.L.c. 176D or G.L.c. 93A, §11, when they denied the Deerskin claim.
ORDER
For all the foregoing reasons it is hereby ORDERED that judgment enter for the defendants, Utica Mutual Insurance Company, on all counts of the plaintiffs complaint.